RANDALL, Circuit Judge:
In a proceeding under the federal bankruptcy laws, an oversecured creditor (a secured creditor whose collateral is worth more than the amount of its debt) is entitled to receive at the conclusion of the proceeding interest on the debt accrued during the proceeding as a part of its allowed claim. By contrast, neither an undersecured creditor (one whose collateral is worth less than the amount of its debt) nor an unsecured creditor is entitled to receive such interest as part of its allowed claim. This case presents the question whether Congress in 1978, in codifying the principles which had developed under the common law to ensure that a secured creditor’s interest in the value of its collateral would be adequately protected during the pendency of a reorganization proceeding, intended that' an undersecured creditor would be entitled to receive during the proceeding periodic cash interest payments on the value of the collateral, even though a claim for interest on the debt would not be allowed at the conclusion of the proceeding. The Ninth and Fourth Circuits hold that an undersecured creditor is entitled as a matter of law to periodic interest payments during the proceeding. In re American Mariner Industries, Inc., 734 F.2d 426 (9th Cir.1984); Grundy National Bank v. Tandem Mining Corp., 754 F.2d 1436 (4th Cir. 1985). The Eighth Circuit holds that an undersecured creditor is not entitled to such payments as a matter of law, but may be so entitled depending on the circumstances. In re Briggs Transportation Co., 780 F.2d 1339 (8th Cir.1985).
*1382 While recognizing the cogent arguments that have been adduced in support of both such positions, we are not persuaded that Congress intended in 1978 to make fundamental changes in the adequate protection rules as they had developed before 1978, or to alter, through adequate protection provisions, the settled rules regarding the accrual and payment of interest during the pendency of a bankruptcy proceeding. Further, a rule requiring periodic postpetition interest payments to undersecured creditors would often have a substantial adverse impact on the orderly procedures for the distribution of a debt- or’s estate upon liquidation or reorganization; would frequently result in a premature reallocation of the unencumbered assets of an estate from unsecured to undersecured creditors; and would materially alter the rule that all creditors generally share some of the risk in a reorganization proceeding that a successful reorganization will not be feasible. We think it unlikely that Congress would have adopted such a rule — entailing, as it does, major changes in the way in which a reorganization proceeding is conducted — without clear, unequivocal statements to that effect in the bankruptcy statute or, at the least, in its legislative history. No such statements appear. To the contrary, the statute and its legislative history strongly suggest, and we hold, that Congress did not intend to provide undersecured creditors with periodic postpetition interest payments on the value of their collateral as an element of adequate protection.
I.
Debtor Timbers of Inwood Forest Associates, Ltd. (“Timbers”) appeals from an order of the United States District Court for the Southern District of Texas affirming the decision of the Bankruptcy Court ordering payment to United Savings Association of Texas (“United”) of cash amounts representing lost “opportunity costs” on the amount of United’s secured claim. “Opportunity costs,” according to United, are the funds it would earn if it were allowed to foreclose its lien, sell the collateral and reinvest the proceeds.[1] United cross-ap *1383 peals, asserting that the formula adopted by the Bankruptcy Court for determining the amount of payments is incorrect.
The underlying facts are not complicated. Timbers is a limited partnership that owns a 188-unit apartment complex in northwest Houston. United holds a ten-year note executed by Timbers in June 1982, in the original principal amount of $4,100,000, secured by a deed of trust on the apartment complex and an assignment of rents. Monthly payments for the first three years of the note were to be $45,842.06, including an interest rate of fourteen percent, plus $7,956 monthly escrow for taxes and insurance. No payment has been made on the note since August 1984. United noticed a foreclosure on the Timbers property at some point, but on March 4, 1985, Timbers filed a petition under Chapter 11 of the Bankruptcy Code of 1978 (“Code” or “Bankruptcy Code”), 11 U.S.C. §§ 101-1330, automatically staying the foreclosure. United and Timbers entered into an agreed order that required Timbers to pay United the net income produced by the apartments.
On March 18, 1985, United moved in the Bankruptcy Court for relief from the automatic stay under § 362(d)(1)[2] “for cause, including the failure [by Timbers] to provide adequate protection of [United’s] security interest.” The Bankruptcy Court held an evidentiary hearing on the motion. Evidence introduced at the hearing indicates that on April 16, 1984, the principal balance of the note was $3,929,319.28 and unpaid accrued interest amounted to $437,-069.49, for a total of $4,366,388.77. Expert testimony introduced by Timbers fixed the “fair market value” of the property at $4,250,000, while United’s expert placed its fair market value at $3,614,000 to $4,230,-000. Timbers’ expert also testified that the “liquidation value” of the property was $2,650,000. Both experts agreed that the property value would appreciate to a modest extent, but United was at the time of the hearing, and for the purpose of this appeal remains, an undersecured creditor. There was no evidence that future appreciation would be able to provide security for interest accruing postpetition under the terms of the note. Neither party presented evidence on the likelihood of successful reorganization.
United argued at the hearing that absent the automatic stay, it would foreclose on and sell the property and reinvest the proceeds at the market rate. It argued that because Timbers had not provided it with “adequate protection” of its “interest” in the present value of the proceeds, the stay should be dissolved. The Bankruptcy Court, in a detailed opinion, agreed in large part with United, and on April 24, 1985, ordered monthly payments of $50,456: $7,956 for the escrow, to commence immediately, and $42,500 for United’s “lost opportunity cost” to commence on September 4, 1985, based on a value on foreclosure of $4,250,000 and a 12% interest rate. 49 B.R. 454 (Bankr.S.D.Tex.1985). The lost opportunity payments are in an amount only slightly less than the monthly principal and interest payment due under the note — $45,-842.06. The court ordered that the lost opportunity payments “may be made from rental receipts otherwise subject to the *1384 agreed cash collateral order herein,” but did not limit Timbers’ obligation to the amount of the net rental income. The Bankruptcy Court relied in large part on the Ninth Circuit’s decision in American Mariner. On appeal, the District Court affirmed.
II.
Many commentators and courts view the issue before us as one of policy and economics. One side opines that the failure to award postpetition interest payments will restrict the availability of secured credit to the detriment of businesses that cannot obtain credit otherwise. The other concentrates on the deleterious effects that post-petition interest payments will have on the possibility of reorganizations. It seems that the debate has become not what the Bankruptcy Code requires, but what it should require. If we were Members of Congress, or if bankruptcy law were not controlled by a statute, we might find the economic debate of primary significance. However, as judges, we must be governed by congressional intent as set forth in the Bankruptcy Code. “The relevant question is not whether, as an abstract matter, the rule advocated ... accords with good policy. The question we must consider is whether the policy [advocated] is that which Congress effectuated by its enactment of” the statute at issue. Badaracco v. Commissioner, 464 U.S. 386, 398, 104 S.Ct. 756, 764, 78 L.Ed.2d 549 (1984). “Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement.” Id.
The issue we face is simply one of statutory interpretation: Does “adequate protection” under § 362(d)(1) contemplate that an undersecured creditor will receive post-petition interest periodically in cash or some other form to compensate it for “lost opportunity” when its right to foreclose is temporarily suspended by the automatic stay? Our role in interpreting statutes is limited:
While the judicial function in construing legislation is not a mechanical process from which judgment is excluded, it is nevertheless very different from the legislative function. Construction is not legislation and must avoid “that retrospective expansion of meaning which properly deserves the stigma of judicial legislation.” Kirschbaum v. Walling, 316 U.S. 517, 522 [62 S.Ct. 1116, 1119, 86 L.Ed. 1638]. To blur the distinctive functions of the legislative and the judicial processes is not conducive to responsible legislation.
Addison v. Holly Hill Fruit Products Co., 322 U.S. 607, 618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944) (Frankfurter, J.).
The familiar starting point in statutory interpretation is the plain meaning rule: “the meaning of the statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, ... the sole function of the courts is to enforce it according to its terms.” Cami-netti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). In interpreting a statute, it must be recalled that:
[E]ach part or section [of a statute] should be construed in connection with every other part or section so as to produce a harmonious whole. Thus it is not proper to confine interpretation to the one section to be construed.
2A N. Singer, Sutherland Statutory Construction § 46.05, at 90 (rev. 4th ed. 1984 & Supp.1985).[3]
With these principles in mind, we turn to an examination of the language of the relevant provisions of the Code. In general, a creditor may receive funds from a debtor after a bankruptcy petition is filed during the two distinct periods of the proceeding: at its termination and during its pendency. *1385 First, we review the sections that determine the amount of a claim that the court may allow at the termination of the proceeding, when the bulk of the estate’s assets historically has been distributed, and whether that claim may include an amount for interest accruing during the proceeding. §§ 502, 506. Second, we examine the provisions requiring adequate protection of a secured creditor’s interest in its collateral during the proceeding, §§ 361-362(d)(l), which under certain circumstances may require payments to a secured creditor from the- estate before the proceeding is concluded.
A. The Allowed Secured Claim and Interest — §§ 502 and 506.
After a debtor files a bankruptcy petition, a creditor may file a proof of claim against the estate in the amount that it asserts is owed to it by the debtor. The claim is deemed to be “allowed” if no party in interest objects, § 502(a), or if the court after notice and a hearing allows the claim, in the amount owing as of the date that the petition was filed, § 502(b). An allowed claim of a creditor secured by a lien on property of the debtor is an “allowed secured claim” to the extent of the value of that creditor’s interest in the property, and is an unsecured claim to the extent that the amount of the allowed secured claim is less than the amount of the allowed claim. § 506(a). The value of the collateral is determined in light of the purpose of the valuation and of the proposed disposition or use of the collateral. § 506(a). A creditor with an allowed secured claim may receive, upon termination of the proceeding or at such earlier time as may be allowed by the court, either the collateral or the value of the collateral up to the amount of the allowed secured claim. See §§ 506(a), 726(a), 1129. To the extent that an allowed claim is unsecured by a lien on property of the estate, the creditor’s allowed claim may be paid out of unencumbered assets of the estate in accordance with the priority schedule set forth in § 507(a). In summary, therefore, an undersecured creditor in effect wears two hats because it has two types of claims at the conclusion of a proceeding: an allowed secured claim in an amount equal to the value of its collateral, and an unsecured claim for any deficiency, which is treated as is any other unsecured claim.[4]
As a general rule, creditors are not allowed a claim for interest accruing on their debts during bankruptcy proceedings. Since the middle of the 18th century, bankruptcy law has provided that interest on debts does not accrue after a bankruptcy petition is filed. Sexton v. Dreyfus, 219 U.S. 339, 344, 31 S.Ct. 256, 257, 55 L.Ed. 244 (1911) (“For more than a century and a half the theory of the English bankrupt system has been that everything stops at a certain date. Interest was not computed beyond the date of the commission.”). The rule developed “not because of the words of the statute, but as a fundamental principle” of equity. Id. The reason for the rule as it developed was as follows:
Exaction of interest, where the power of a debtor to pay even his contractual obligations is suspended by law, has been prohibited because it was considered in the nature of a penalty imposed because of delay in prompt payment — a delay necessitated by law if the courts are properly to preserve and protect the estate for the benefit of all interests involved____ “[T]he delay in distribution is the act of the law; it is a necessary incident to the settlement of the estate.”
Vanston Bondholders Protection Committee v. Green, 329 U.S. 156, 163, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946) (quoting Thomas v. Western Car Co., 149 U.S. 95, 116-17, 13 S.Ct. 824, 833, 37 L.Ed. 663 (1893)). In other words, allowing the accrual of postpetition interest in favor of one creditor would be “inequitable” to other creditors. Vanston, 329 U.S. at 164, 67 *1386 S.Ct. at 240; cf. Ticonic National Bank v. Sprague, 303 U.S. 406, 411, 58 S.Ct. 612, 614, 82 L.Ed. 926 (1938) (“It is in order to assure equality among creditors as of the date of insolvency that interest accruing thereafter is not considered.”). Justice Stewart reiterated this rationale in Nicholas v. United States, 384 U.S. 678, 86 S.Ct. 1674, 16 L.Ed.2d 853 (1966):
We believe that the decisions of this Court in Sexton and [New York v.] Super [, 336 U.S. 328, 69 S.Ct. 554, 93 L.Ed. 710 (1949),] reflect the broad equitable principle that creditors should not be disadvantaged vis-a-vis one another by legal delays attributable solely to the time-consuming procedures inherent in the administration of the bankruptcy laws. In the context of interest-bearing debts, the equitable principle enunciated in Sexton and Super rests at bottom on an awareness of the inequity that would result if, through the continuing accumulation of interest in the course of subsequent bankruptcy proceedings, obligations bearing relatively high rates of interest were permitted to absorb the assets of a bankruptcy estate whose funds were already inadequate to pay the principal of the debts owed by the estate.
384 U.S. at 683-84, 86 S.Ct. at 1679.
The rule barring accrual of postpetition interest on secured debt did not apply in certain situations where the reason for the rule was itself inapplicable. First, an oversecured creditor was entitled, depending on the equities of the situation, to claim postpetition interest, but only to the extent that the principal of the debt plus accrued interest did not exceed the value of the collateral securing the debt and the interest.[5] Vanston, 329 U.S. at 164-65, 67 S.Ct. at 240-41; Sexton, 219 U.S. at 346, 31 S.Ct. at 258; Coder v. Arts, 152 F. 943, 950 (8th Cir.1907), aff'd, 213 U.S. 223, 29 S.Ct. 436, 53 L.Ed. 772 (1909). Further, secured creditors (and unsecured creditors, as well) might be entitled to postpetition interest if the debtor’s estate ultimately proved to be solvent. American Iron & Steel Mfg. Co. v. Seaboard Airline Railway Co., 233 U.S. 261, 266, 34 S.Ct. 502, 504, 58 L.Ed. 949 (1914) (“if as a result of good fortune or good management, the estate proved sufficient to discharge the claims in full, interest as well as principal should be paid”).[6]
This rule regarding accrual of postpetition interest arose when the bankruptcy laws did not provide for reorganization and consisted only of a mechanism to liquidate an estate equitably. See American Iron and Steel Mfg. Co., 233 U.S. at 266, 34 S.Ct. at 504. Nevertheless, as the bankruptcy laws developed to provide for reorganizations, the rule was extended to Chapter XI of the Bankruptcy Act of 1898 (“Act”) arrangement proceedings so that “the accumulation of interest must be suspended as of the date the Chapter XI petition was filed,” Nicholas, 384 U.S. at 686, 86 S.Ct. at 1681, and to corporate reorganization proceedings under Chapter X of the Act, id. at 686 n. 14, 86 S.Ct. at 1681 n. 14.[7]
*1387 The Code expressly continued these prevailing rules.[8] Under § 502(b)(2), a claim against an estate will not be allowed to the extent that “such claim is for unmatured interest” as of the date of the filing of the petition. Section 506(b) continues the pre-Code rule applicable to the oversecured creditor:
(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.[9]
The Code continues to treat oversecured and undersecured creditors differently as to their entitlement to a claim for postpetition interest at the end of a reorganization proceeding.
In summary, the interest provisions of the Code and its predecessors, as interpreted by the Supreme Court for almost a century, are premised on the equitable principle that the unencumbered assets of a debtor’s estate will not be used to benefit one class of creditors at the expense of another class. Such would be the case if unencumbered assets, otherwise available for the payment of unsecured claims, were used to pay postpetition interest on un-dersecured debt. Allowing a claim for postpetition interest by an oversecured creditor, on the other hand, is not inconsistent with that equitable principle, because only assets encumbered by the creditor’s lien will be used to fund the payment of postpetition accrued interest.'
B. The Automatic Stay and Adequate Protection Payments — §§ 361 and 362.
Upon the filing of a bankruptcy petition, § 362(a) of the Code imposes an automatic stay on actions by creditors to collect their claims from a debtor. Section 362(a) temporarily bars a creditor from, among other things, foreclosing on a debtor’s property to enforce a security interest. The purpose of the automatic stay is to “give[] the business a breathing spell and time to work constructively with its creditors” to propose a plan of reorganization, as well as to prevent creditors from “obtaining preferential treatment by quick action.” House Report, supra, at 174.[10]
Under § 362(d), a creditor may obtain relief from the stay (1) “for cause, including the lack of adequate protection” *1388 of the creditor’s interest in the collateral, or (2) when a “debtor does not have an equity in” the property and “the property is not necessary to an effective reorganization.” If a creditor files a complaint seeking relief from the stay under § 362(d), the burden of proof, or the risk of non-persuasion, is on the debtor for all issues except the issue of the debtor’s equity in the property, § 362(g). Therefore, in a proceeding arising under § 362(d)(1), the debtor must prove that the secured creditor’s interest is adequately protected, or the automatic stay will lift.
The phrase “adequate protection of an interest in property” set forth in § 362(d)(1) is not defined in the Code. However, § 361 lists three ways that “adequate protection may be provided.” Under § 361(1), a debt- or may be required to make a cash payment or periodic cash payments to a creditor, to the extent that the stay “results in a decrease in the value of” the creditor’s interest in the property. This method would seem to be particularly appropriate when collateral is depreciating at a steady rate. Under § 361(2), a creditor may be given a lien on unencumbered property, again to the extent that the stay “results in a decrease in the value of” the creditor’s interest in the property. This would appear to protect a secured creditor when a debtor proposes to use cash collateral or may consume other collateral at an uneven rate, such as inventory.
Under § 361(3), a catch-all provision, the court may “grant other relief ... as will result in the realization by [the creditor] of the indubitable equivalent of” the creditor’s interest in the property. A guarantee or bond by a third person not involved in the proceeding might provide such protection. Section 361(3) expressly states, however, that providing a creditor with an administrative priority claim as a form of adequate protection is precluded, although an administrative priority is automatically provided by § 507(b) in the event that the form of adequate protection actually provided by the court ultimately proves to be insufficient.
Clearly neither subsection (1) nor (2) authorizes periodic payments to a creditor whose collateral is not decreasing in value. The issue presented in this case is whether subsection (3) was intended by Congress to permit the periodic payment to an underse-cured creditor of postpetition interest on the value of its collateral when that creditor would not have a claim for postpetition interest at the conclusion of the proceeding, or whether Congress simply intended subsection (3) to permit a bankruptcy judge to fashion methods of protection against a decline in value of collateral alternative to those set forth in subsections (1) (cash payments) and (2) (replacement liens).
The origin of the phrase “indubitable equivalent” that appears in § 361(3) arguably provides support for a conclusion that § 361(3) goes beyond protection against a decline in value of the collateral and requires payment of postpetition interest.[11] The phrase first appeared in Judge Learned Hand’s leading opinion in In re Murel Holding Co., 75 F.2d 941 (2d Cir. 1935), which held in the context of the proposed confirmation of a plan proposed by a debtor over the dissent of a secured creditor (commonly called a cram-down) that the dissenting secured creditor was entitled to the present value of his secured claim in cash or “a substitute of the most indubitable equivalence.” Id. at 942. The court noted that the usual way the equivalent of a claim is provided following confirmation of a plan of reorganization is by paying the creditor post-confirmation interest on the amount of the claim. By using the “indubitable equivalent” phrase in § 361, Congress conceivably imported the standard for the confirmation of a plan over the dissent of a class of secured credi *1389 tors into the adequate protection provisions of the Code, requiring protection of the present value of a creditor’s secured claim during the stay.
Reliance on the phrase to award postpetition interest payments as protection of a creditor’s interest, however, begs the question: “indubitable equivalent” in § 361(3) refers to a substitute for a particular interest; it does not define the interest. Subsections (1) and (2) state that the creditor is protected against a decline in the value of the collateral occasioned by the use, sale or lease of the collateral by the debtor during the stay. Subsection (3) does not state what interest is to be protected during the automatic stay. In the context of the entire section, it is certainly possible that subsection (3) simply gives the court means of providing adequate protection that are alternatives to those set forth in (1) and (2), periodic cash payments and replacement liens, to compensate a creditor for a decline in value of its collateral.[12] If that is the case, subsection (3) does not expand the range of substantive creditor interests protected.
Indeed, overreliance on Murel in this situation may be barred by the language of Murel itself. The court stated that the Act required post-plan interest payments to provide a secured creditor with complete compensation. However, the court plainly added that “[n]o doubt less [than complete compensation] will be required- to hold up the suit for a short time until the debtor shall have a chance to prepare; much depends upon how long he has had already, and upon how much more he demands.” Id. at 943.[13]
Our examination of the language of the adequate protection provisions suggests that they were intended to protect a secured creditor against a decrease in the value of its collateral due to the debtor’s use, sale or lease of that collateral during the stay. There is little in the language of the statute to support a requirement that a debtor make periodic postpetition interest payments to an undersecured creditor, particularly when the Code makes it unmistakably clear that an undersecured creditor is not entitled to a claim for such interest at the conclusion of the proceeding. However, in using the “indubitable equivalent” language in § 361(3), Congress conceivably intended to protect the present value of a secured creditor’s collateral during the stay, rather than simply its value. Accordingly, we must conclude that § 361 is not only ambiguous on its face but also when considered in light of the interest provisions of the Code. We have already considered briefly the legislative history of the interest provisions of the Code, see supra note 8, and we turn now to the legislative history of the adequate protection provisions for further enlightenment.
III.
Helpful to an understanding of what Congress intended by the phrase “adequate protection” in the Code is a review of the law existing at the time the Code was enacted in 1978 and the preenactment history of the stay provisions, because Congress expressly indicated that it intended to codi *1390 fy certain aspects of the existing common law and rules. Further, “[t]he normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific.” Mid-lantic National Bank v. New Jersey, — U.S. —, 106 S.Ct. 755, 760, 88 L.Ed.2d 859 (1986). That rule is “followed ... with particular care in construing the scope of bankruptcy codifications.” Id. See also United States v. Whiting Pools, Inc., 462 U.S. 198, 208, 103 S.Ct. 2309, 2315, 76 L.Ed.2d 515 (1983) (construing provision of Bankruptcy Code to be “consistent with judicial precedent predating” Code at least when “[njothing in the legislative history evinces a congressional intent to depart from” pre-Code practice). Committee hearings and the House and Senate committee reports accompanying respective versions of the proposed Code and statements by congressional leaders also provide important indications of congressional intent.
A. Pre-enactment History.
The rules Congress set forth in § 361 and § 362 regarding the automatic stay and the circumstances under which it might be lifted were not particularly innovative. Rather, even absent express statutory authority, the Supreme Court held as long ago as 1845 that the bankruptcy court had the equitable power to restrain creditors from enforcing liens after a bankruptcy petition was filed. Ex parte Christy, 44 U.S. (3 How.) 292, 11 L.Ed. 603 (1845); see also Mueller v. Nugent, 184 U.S. 1, 14, 22 S.Ct. 269, 274, 46 L.Ed. 405 (1902). And creditors’ interests were not ignored before a lack of adequate protection was expressly codified as a reason for lifting the stay: “Case law had made adequate protection of the secured creditor a major consideration long before the [draft predecessor of the Code] proposed to codify it as a requirement.” Webster, Collateral Control Decisions in Chapter Cases: Clear Rules vs. Judicial Discretion, 51 Am.Bankr.LJ. 197, 237 (1977).
Protection of secured creditors’ rights was frequently considered by the Supreme Court in connection with constitutional concerns raised by secured creditors. These cases primarily address creditors’ rights at the time of confirmation of a plan, but the principles they enunciate are equally applicable to stays at the outset, and provide guidance on the limits of the equitable powers of the court that remain valid. 2 Collier on Bankruptcy 11362.01, at 362-11, 362-12 (15th ed. 1980). In general, the Fifth Amendment requires only that the value of the secured position of a creditor be maintained during the stay.[14] *1391 Within this constitutional limit, general rules evolved in the courts governing the exercise of their equitable power to grant[15] or lift a stay. The courts developed four factors to determine whether to vacate a stay:
(1) Would continuation of the stay result in an undue risk of material harm to the secured creditor?
(2) Was there a reasonable possibility of reorganization or rehabilitation?
(3) Was the property in question needed by the debtor or necessary to rehabilitation?
(4) Was there any equity in the property that might be realized for the benefit of the debtor or its creditors?
Id. at 362-22, 362-23. Although “[a] positive answer on the first point ... was almost invariably fatal to the debtor,” in determining “whether to vacate the stay, courts tended to emphasize the need for judicial flexibility and the need to apply equitable considerations in determining the ‘balance of the hurt.’ ” Id. at 362-23. The weight of the factors depended to some extent on the chapter of the Act governing the proceeding.
In a Chapter X proceeding, involving a corporate reorganization, the stay was usually vacated if its continuance would result in “material harm” to a secured creditor, but the other factors were frequently important. Id. A creditor was not materially harmed by the stay when the value of its lien was maintained during the pendency of the stay. In the case of depreciating collateral, this typically required periodic cash payments or other transfers of value equal to the depreciation to be provided to the creditor.
However, in In re Yale Express System, Inc., 384 F.2d 990 (2d Cir.1967), the court arguably softened that requirement. Yale Express involved collateral (truck trailers) depreciating through use by the debtor. The court held that “to such extent as [the secured creditor] has been damaged by the use of its property pending the reorganization, it is entitled to equitable consideration in the reorganization plan.” Id. at 992. In other words, the secured creditor apparently was entitled only to an administrative priority to compensate for depreciation; Yale Express seems to havé adopted the dubious assumption that administrative expenses would be paid in full.[16] In In re Bermec Corp., 445 F.2d 367 (2d Cir.1971), the court retreated from Yale Express. To protect the creditor’s interest in the collateral, the court ordered that the debtor periodically pay the secured creditors in cash for the “economic depreciation” of the collateral, id. at 369,[17] rather than force the *1392 creditor to accept a more risky administrative priority.
A Chapter XI petition proposed an arrangement, or “any plan by a debtor for the settlement, satisfaction, or extension of the time of payment of his unsecured debts, upon any terms.” 8 Collier on Bankruptcy H 4.01, at 343 (14th ed. 1976). Chapter XI’s express stay provision, 11 U.S.C. § 714 (1976) (repealed 1978), allowed the court to enter a stay “for cause shown,” [18] and under the rules, the stay could be lifted “for cause shown,” Rule ll-44(d). Because under Chapter XI a secured claim could not be affected by the arrangement, “stronger grounds should be required to continue the stay against a lienor in a Chapter XI case than would be required in a proceeding ... under present Chapter X, and it should particularly be shown that continuation of the stay will cause no substantial injury to the lienor.” 8 Collier on Bankruptcy H 3.22, at 256 (14th ed. 1976). See Lance, Inc. v. Dewco Services, Inc., 422 F.2d 778, 782 (9th Cir. 1970).[19]
Chapter XII of the Act governed cases involving real property arrangements by persons other than corporations. Chapter XII also had express stay provisions, and a creditor could obtain relief from the stay “for cause shown.”
B. Criticism of Pre-Code Stay Provisions.
The automatic stay provisions of the Bankruptcy Act had the salutary goal of “protection of the estate of the bankrupt against the ravages that would be inflicted on the estate if grab law were allowed to govern.” Kennedy, The Automatic Stay in Bankruptcy, 11 U.MiehJ.L.Ref. 175, 187 (1977) [hereinafter cited as Automatic Stay /]. However, the estate’s interests were not overriding; the stay was to be lifted “for cause,” including material harm to a secured creditor. Thus Congress and the courts attempted to strike a balance between the interests of debtors, unsecured creditors and the public in the rehabilitative process, and secured creditors’ rights to foreclose on collateral upon default.
In light of the harm that could befall secured creditors due to the stay, the bankruptcy rules provided that stay relief requests were to receive “priority” in the bankruptcy courts. However, it appears that Congress’ aspiration to expedite stay relief litigation was not realized:
Unfortunately, it has been said that this provision of the rule is more honored in the breach than in the performance. It may be extremely difficult in an active bankruptcy court to disrupt scheduled proceedings to conform with the requirements of Rule ll-44(d). The intent of this provision, although laudatory, may be incompatible with the actual functioning and operations of the bankruptcy court under the present Act.
*1393 Miller, supra, 94 Banking L.J. at 704-05.[20] Delay also was due to procedure under the rules. A request for relief from the stay was initiated by a complaint in an adversary proceeding, which “caused significant difficulties in the administration of bankruptcy estates,” because the debtor often asserted complex affirmative defenses or counterclaims. Peitzman & Smith, The Secured Creditor’s Complaint: Relief from the Automatic Stays in Bankruptcy Proceedings, 65 Calif.L.Rev. 1216, 1259 (1977). That, in turn, was “said to forestall prompt action on the request for relief from the stay.” Kennedy, Automatic Stays Under the New Bankruptcy Law, 12 U.MichJ.L. Ref. 1, 40 n. 166 (1978) [hereinafter cited as Automatic Stay //].
C. History of Bankruptcy Reform Act.
1. Commission Proposals.
In response to numerous calls for reform of the bankruptcy laws, Congress established the Commission on Bankruptcy Laws of the United States in 1970. After two years of research and public and private meetings, the Commission submitted a report on the bankruptcy laws and draft legislation to correct perceived inadequacies in the Act, particularly in the area of administration. The draft legislation accompanying the Report proposed to codify the common law standards for adequately protecting secured creditors during the pendency of the automatic stay. Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc. No. 137, pt. II, 93d Cong., 1st Sess. 236-37 (1973) [hereinafter cited as Commission Report ].[21] The official comments accompanying the proposed legislation explained the purpose of the section:
1. This section is new. It is essentially a codification of such cases as In re Yale Express System, Inc., 384 F.2d 990 (2d Cir.1967) and In re Bermec, 445 F.2d 367 (2d Cir.1971). See generally Festersen, Equitable Powers in Bankruptcy Rehabilitation: Protection of the Debtor and the Doomsday Principle, 46 Am.Bankr. L.J. 311, 324-33 (1972)....
3____No attempt has been made to codify the case law as to when the use of collateral must cease or as to the adequacy of protection in any given situation. This is left to case-by-case development by the courts. A benchmark in determining the adequacy of protection is the liquidation value of the collateral at the date of the petition. This is analgous [sic] to the “cram down” provision of § 7-303(7). Conditions which may be imposed by the court, when appropriate, include (1) requiring other security of an equivalent value; (2) if there is no equity or the equity is marginal, requiring additional security to the extent of the anticipated decrease in the value of collateral as a result of use; and (3) giving a priority if it is clear that the proceeds of the liquidation of the property of the estate available to pay the claim will be sufficient.
Id. at 236-37 (emphasis added). The “objective” of the Commission’s proposal “was to permit use of the property subject to payments or other transfers that would compensate the secured creditor for the decline in recoverable value.” Nimmer, Secured Creditors and the Automatic Stay, 68 Minn.L.Rev. 1, 8 (1983). The Commission’s suggested standard for relief from the automatic stay clearly would not have allowed periodic interest payments for the delay in enforcing foreclosure rights.
*1394 2. Committee Hearings.
The Commission’s draft legislation and alternative legislation drafted by the National Conference of Bankruptcy Judges were introduced in 1973 and 1974 and reintroduced in 1975.[22] Congress held extensive hearings on the draft legislation throughout 1975 and 1976. See Bankruptcy Act Revision: Hearings on H.R. 31 and H.R. 32 before the Subcomm. on Civil and Constitutional Rights, House Comm, on the Judiciary, 94th Cong., 2d Sess. (1976) [hereinafter cited as House Hearings]; Hearings on S. 235 and S. 236 before the Subcomm. on Improvements in Judicial Machinery, Senate Comm, on the Judiciary, 94th Cong., 1st Sess. (1975) [hereinafter cited as Senate Hearings ].
Numerous witnesses for secured creditors testified on the proposed legislation.[23] Insofar as the automatic stay provision was concerned, nearly all witnesses, including those representing secured creditors, favored retention of the Commission’s provision in substance.[24] Numerous witnesses did suggest certain changes to address two concerns: (1) delay in reorganization proceedings, and (2) the danger of consumption of collateral, particularly “soft” collateral. For example, several witnesses advocated speed and flexibility in the reorganization process so that the proceedings could be concluded “in a matter of months rather than years.” House Hearings, supra, at 437.[25] Further, several contended that the Commission proposal did not adequately protect creditors against a decline in value of the collateral, particularly “soft” or “self-liquidating” collateral such as cash, accounts receivable, chattel paper, contract rights, and inventory.[26] Several *1395 witnesses supported the Commission’s general proposal to codify the common law standard protecting against depreciation during the stay, but suggested that various examples of how to provide protection to the secured creditor, which the Commission had set forth in its Comments, be codified.[27]
The simple fact is that in thirty-five days of in-depth hearings before the House subcommittee resulting in over 2700 pages of testimony from more than 100 witnesses, as well as in Senate hearings that were nearly as extensive, the subject of periodic postpetition interest payments for underse-cured creditors was not raised in the testimony or prepared statement of a single witness.[28] Not one of the many witnesses *1396 for secured creditors even mentioned the award of postpetition interest payments or sought compensation for the delay required by the stay. Viewed in this context, it seems unlikely that Congress intended the adequate protection provisions to require periodic payment of postpetition interest to an undersecured creditor.
3. Amendments and Committee Reports.
Following the committee hearings, the Commission’s proposals were redrafted and reintroduced in the House and Senate. Thereafter, the legislation that became the Bankruptcy Reform Act of 1978 went through further revisions before its final enactment by Congress. Accordingly, statements in the legislative history must be carefully compared to the version of the bill to which they referred. As in most analyses of legislative history, “[t]he best method ... is to begin with the most recent statement of authority and delve backward through the legislative process.” Klee, Legislative History, supra, 28 DePaul L.Rev. at 957. However, we will begin by reviewing post-hearing amendments and the House and Senate Judiciary Committee reports although they are not the most recent statements of authority, because the final version of the bill may be more readily understood if the chronological development of its components is known.
Proposed § 362(d) of the House bill favorably reported by the Judiciary Committee on September 8, 1977, H.R. 8200, provided that the automatic stay could be lifted “for cause, including the lack of adequate protection of an interest in property” of a creditor. The House Report stated that “[t]he interests of which the court may provide protection ... include equitable as well as legal interests,” citing as an example “a right to recover property under a consignment.” House Report, supra, at 338, U.S.Code Cong. & Admin.News 1978, p. 6294. Section 361 was designed “to illustrate means by which [adequate protection] may be provided and to define the contours of the concept.” Id. The Report summarized the concept of adequate protection:
The concept is derived from the fifth amendment protection of property interests. See Wright v. Union Central Life Ins. Co., 311 U.S. 273 [61 S.Ct. 196, 85 L.Ed. 184] (1940); Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555 [55 S.Ct. 854, 79 L.Ed. 1593] (1935). It is not intended to be confined strictly to the constitutional protection required, however. The section, and the concept of adequate protection, is based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy laws. Thus, this section recognizes the availability of alternate means of protecting a secured creditor’s interest. Though the creditor might not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for.
Id. at 339, U.S.Code Cong. & Admin.News 1978, p. 6295.
The Report discussed four “neither exclusive nor exhaustive” examples or means of providing adequate protection set forth in the House’s proposed § 361. Codification of the examples was apparently in response to the suggestions of numerous witnesses for secured creditors that the section drafted by the Commission gave too much discretion to the bankruptcy judge. Proposed § 361(1), assertedly patterned on the protection devised in In re Yale Express, but actually closer to that set forth in In re Bermec, would permit “periodic cash payments by the estate, to the extent of a decrease in value of the opposing entity’s interest in the property involved.” House Report, supra, at 339, U.S.Code Cong. & Admin.News 1978, p. 6295. *1397 “[WJhere, for example, the property in question is depreciating at a relatively fixed rate,” periodic payments would “compensate for the depreciation.” Id. Proposed § 361(2) provided for “an additional or replacement lien on other property to the extent of the decrease in value of the property involved.” Id. That would “provide the protected entity with a means of realizing the value of the original property, if it should decline during the case____” Id. at 339-40, U.S.Code Cong. & Admin. News 1978, p. 6296.
Proposed § 361(3), which was apparently based on Yale Express, would have granted “an administrative expense priority to the protected entity to the extent of his loss.” House Report, supra, at 340, U.S. Code Cong. & Admin.News 1978, p. 6296. Because the method would be “risky,” it was only to be used “when there is relative certainty that administrative expenses will be able to be paid in full in the event of liquidation.” Id.
Proposed § 361(4), a catch-all provision, would have allowed the court to grant “such other relief as will result in the realization by the protected entity of the value of its interest in the property involved.” Id.[29] The report offered as an example a “guarantee by a third party outside the judicial process of compensation for any loss incurred in the case.” Id.
The Report noted that all four methods “rely ... on the value of the protected entity’s interest in the property involved.” Id. However, “[t]he section does not specify how value is to be determined, nor does it specify when it is to be determined. These matters are left to case-by-case interpretation and development.” Id.[30]
The House Report was somewhat cryptic in its general discussion of “the contours of the concept” of adequate protection. The paragraph of the report that has provided the most support for the American Mariner line of cases is contained within this discussion, the statements that “[sjecured creditors should not be deprived of the benefit of their bargain,” House Report, supra, at 339, U.S.Code Cong. & Admin. News 1978, p. 6295, and that adequate protection is intended to result in “realization” by the secured creditor “of the value of its interest in the property involved,” id. at 340, U.S.Code Cong. & Admin.News 1978, p. 6296. The report does not explain the “benefit of their bargain” of which secured creditors should not be deprived. In the context of the entire report, however, it seems likely that the bargain referred to is the bargain to receive the collateral or its value upon default. Although the stay temporarily prevents that aspect of the bargain from being fulfilled, a creditor should not be prejudiced by a debtor’s continued use of collateral during the proceeding. That bargain must be protected by compensating for a decline in the value of the collateral through its use during the pendency of the stay.
*1398 Meanwhile, the Senate was- considering companion legislation, in which the language of proposed §§ 361 and 362(d) differed somewhat. Section 362(d) in the Senate proposal stated in part, as did the House version, that a party could obtain relief from the automatic stay “for cause, including the lack of adequate protection of an interest in property of such party in interest.” The version of § 361 contained in the Senate proposal, S.2266, differed substantially from that in the House version, H.R. 8200, in that it did not incorporate the third and fourth subsections in the House’s § 361; it specified only two ways of providing adequate protection. First, the Senate Committee report explained that § 361(1) would authorize periodic cash payments to compensate for depreciation, in accordance with the principles set forth in In re Bermec. Second, under § 361(2) the secured creditor might be protected against a “decline during the case” by “an additional or replacement lien on other property of the debtor to the extent of the decrease in value or actual consumption of the property involved.” Senate Report, supra, at 54, U.S.Code Cong. & Admin.News 1978, p. 5840. The Senate Report stated that § 361 would be “consistent with the view expressed in Wright v. Union Central Life Ins. Co., 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940), where the Court suggested that it was the value of the secured creditor’s collateral, and not necessarily his rights in specific collateral, that was entitled to protection.” Senate Report, supra, at 54, U.S.Code Cong. & Admin.News 1978, p. 5840. The Senate proposal contained no catch-all provision. Accordingly, it seems clear that the Senate version of § 361 would have protected only against a decline in value.
The Senate’s version of § 361 openly favored secured creditors in one regard: the panel rejected “the granting of an administrative priority as a method of providing adequate protection to an entity as was suggested in In re Yale Express” and the House’s § 361(3) “because such protection is too uncertain to be meaningful.” Senate Report at 54, U.S.Code Cong. & Admin. News 1978, p. 5840.[31] The secured creditor was faced with too large a risk in the event of a decline in value of its collateral because the estate might be insufficient to pay all its administrative expenses. Further, the Senate’s proposed § 362(d) favored secured creditors by placing a thirty-day limit for court action on motions for relief from the stay.
The Senate passed its bill as a substitute to the House’s version on September 7, 1978. Because of the substantial differences in the House and Senate proposals, largely concerning the status of the bankruptcy courts, the leaders and staff members of the House and Senate Judiciary Committees “met, negotiated and agreed on many changes” in an effort to reconcile the two versions. 4 W. Norton, Bankruptcy Law and Practice ix n. 1 (1985). No conference committee was appointed. Id.[32] There is no formal or informal summary or transcript of these meetings in the published legislative history of the Code.
On September 28, 1978, the House took up the negotiated compromise that would become the new Code. Rep. Edwards’ explanation of the agreed-upon changes on the floor of the House, “as a consensus of these committee leaders, carrpes] a weight in the legislative history equal to a conference report.” Id.; see also 124 Cong.Rec. 32,391 (1978) (remarks of Rep. Rousselot) (statement by Rep. Edwards has “the ef- *1399 feet of being a conference report”).[33] The committee leaders agreed to amend proposed § 362(d) to its current language, and also substantially altered § 361. The compromise version of § 361 deleted the House’s method of providing adequate protection of a decline in value with an administrative priority. Further, the compromise inserted the words “indubitable equivalent” for the word “value,” which had appeared in § 361(4) of the House version of H.R. 8200: relief other than periodic cash payments or a replacement lien, but not an administrative priority, might be granted to “result in the realization by [a secured creditor] of the indubitable equivalent of such entity’s interest in such property.” Rep. Edwards explained the compromise on the floor of the House immediately before the vote on it:
Section 361 of the House amendment represents a compromise between H.R. 8200 as passed by the House and the Senate amendment regarding the issue of “adequate protection” of a secured party. The House amendment deletes the provision found in section 361(3) of H.R. 8200 as passed by the House. It would have permitted adequate protection to be provided by giving the secured party an administrative expense regarding any decrease in the value of such party’s collateral. In every case there is the uncertainty that the estate will have sufficient property to pay administrative expenses in full.
Section 361(4) of H.R. 8200 as passed by the House is modified in section 361(3) of the House amendment to indicate that the court may grant other forms of adequate protection, other than an administrative expense, which will result in the realization by the secured creditor of the indubitable equivalent of the creditor’s interest in property____ Adequate protection of an interest of an entity in property is intended to protect a creditor’s allowed secured claim. To the extent the protection proves to be inadequate after the fact, the creditor is entitled to a first priority administrative expense under section 507(b).
In the special case of a creditor making an election under section 1111(b)(2), that creditor is entitled to adequate protection of the creditor’s interest in property to the extent of the value of the collateral not to the extent of the creditor’s allowed secured claim, which is inflated to cover a deficiency as a result of such election.
124 Cong.Rec. 32,395 (1978) (emphasis added). Sen. DeConcini made an identical explanation of the bill before the Senate vote. Further, Rep. Butler, who was actively involved in drafting the bill and in negotiating the compromise between the House and Senate versions, stated on the floor of the House just before the vote on the compromise version that under the bill “[cjreditors are provided adequate protection of their interest during the course of a case and limitations are placed on the use of collateral.” 124 Cong.Rec. 32,418 (1978). Rep. Butler explained when adequate protection would be required under the version of § 361 actually enacted: “If a creditor is concerned that property is being misused or depreciating, the creditor can demand adequate protection or relief from the automatic stay.” Id. at 32,419 (emphasis added).
These are the clearest and most probative expressions of congressional intent concerning §§ 361-362(d). The clear implication of Rep. Butler’s statement is that if property is not being misused or depreciating, then a secured creditor is not entitled to adequate protection payments. As for Rep. Edwards’ explanation, if we recall what constitutes an “allowed secured claim,” we define the “interest in property” that §§ 361-362 are designed to protect. First, an allowed claim may not include *1400 “unmatured interest,” § 502(b)(2). See Fortgang & King, The 1978 Bankruptcy Code: Some Wrong Policy Decisions, 56 N.Y.U.L.Rev. 1148, 1150 (1981) (“Postpetition interest under the Code, as distinguished from the Bankruptcy Act, explicitly is made a nonallowable part of a creditor’s claim.”).[34] Second, a “claim is an allowed secured claim to the extent of the value of the collateral____” Klee, All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code, 53 Am. Bankr.LJ. 133,152 (1979) [hereinafter cited as Cram Down ]. Therefore, the remarks of Rep. Edwards strongly suggest that what was intended to be adequately protected by § 361 is the creditor’s allowed secured claim — the value of its collateral.[35] It seems unlikely that § 361(3) was intended to require periodic postpetition interest payments when the very interest to be protected — the allowed secured claim — cannot itself include postpetition interest.[36]
The evolution of §§ 361-362 during the legislative process lends further support to this conclusion. The House-Senate meetings produced two compromises in § 361. The House proposal that § 361 include the provision regarding an administrative expense priority to compensate for a decline in the value of the collateral, as had been done in In re Yale Express, was deleted by the Senate, and the House-Senate conferees agreed on the deletion because of “the uncertainty that the estate will have sufficient property to pay administrative expenses in full.” 124 Cong.Rec. 32,395 (1978) (remarks of Rep. Edwards). Further, the conferees agreed to include a general catch-all provision in the compromise version, as had been set forth in the final House version of the bill but not in the Senate version. However, they modified its language to state that the “indubitable equivalent” of the creditor’s interest in the collateral must be protected, rather than the “value” of the interest as the House had recommended. Rep. Edwards did not explain the modification of the House bill to include “indubitable equivalent.”
We are properly reluctant to place significant weight on the unexplained action of the conferees when they added the “indubitable equivalent” language, particularly when the mute change would alter settled law.[37] However, it seems likely that the *1401 following may have happened: the Senate refused to accept the House’s codification of In re Yale Express, because that would have subjected creditors to too great a risk that they would not be protected against a diminution in value.[38] The House, on the other hand, prevailed as to the “catch-all” provision; the Senate version would have allowed only periodic cash payments or a replacement lien to compensate for depreciation, while the House version recognized “other relief,” such as a guarantee by a third person or a bond. The Senate may have been reluctant to subject creditors to the vagaries of that subsection, so the conferees added the “indubitable equivalent” language to ensure that, if a court did not order less risky periodic payments or a replacement lien to compensate for a decline in the value of the collateral occasioned by the use, sale, or lease of the collateral by the debtor during the stay, the “other relief” unquestionably, or indubitably, would provide the creditor with the equivalent of the value of the property lost. Although, as we have discussed, the indubitable equivalent language was taken from Murel Holding, a cram-down case, no aspect of the legislative history indicates that the Senate’s clearly expressed view as to the interest to be protected, namely the amount of the creditor’s secured claim, was to be affected by the inclusion of the “indubitable equivalent” phrase in the compromise version. The legislative history is devoid of any indication that Congress meant to import wholesale the standards for adequate protection of secured creditors in a cram-down into the adequate protection provisions applicable during the stay.
The provisions underwent substantial revision in the legislative process, but the fundamental concept of the draft legislation that only depreciation of collateral must be protected against was not explicitly criticized or rejected at any point in the proceedings.[39] Further, at no point in the proceedings did Congress evince a decision to alter the settled rules regarding adequate protection and postpetition interest which the Commission attempted to codify. It seems likely that § 361 is merely “a codification of the case law that [had] developed under the [pre-Code] automatic stay rules,” Kennedy, Automatic Stay II, supra, at 43 n. 177, except the rule of In re Yale Express.[40] Those rules did not permit periodic postpetition interest payments to ah undersecured creditor. If Congress had intended to change those rules, the intention would have been clearly expressed, not left to be inferred from isolated phrases in the legislative history. Midlantic National Bank, 106 S.Ct. at 760.
IV.
We turn now to other provisions of the Code that bear indirectly on the question, including some “provisions” that the courts *1402 have been forced to improvise, and to basic policies and procedures underlying the Code that will be directly affected by our resolution of the question.
A. The Cram-down Provisions — § 1129.
We have seen that Judge Learned Hand in In re Murel Holding Co., 75 F.2d 941 (2d Cir.1935), held in the context of a proposed confirmation of a plan of reorganization, proposed by a debtor over the dissent of a secured creditor (one form of cram-down), that the dissenting secured creditor was entitled to the present value of its secured 'claim in cash or “a substitute of the most indubitable equivalence.” Id. at 942. Judge Hand noted that the usual way the equivalent of a claim is provided in a plan of reorganization that contemplates a deferred payout of the claim is by paying a creditor interest on the amount of its claim. In 1978, Congress did codify the holding of Murel, as distinguished from its rhetoric, in the cram-down provisions of the Code.
In § 1129(b)(2)(A)(i), Congress clearly set forth the requirement of Murel that a secured creditor receive over time the present value of its allowed secured claim in order for a proposed plan of reorganization to gain court approval:[41]
(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
[ (A)(i) ] (II) That each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder’s interest in the estate’s interest in such property.
When the right of a creditor to payment of its allowed secured claim is delayed in the cram-down situation, Congress expressly ordered compensation for delay, in accord-anee with the holding in Murel; it failed to use similar language in § 362(d)(1) or in § 361. This supports a conclusion that Congress knew what it was doing when it expressly ordered that secured creditors receive interest payments for the deferral of their repayments in the cram-down situation, but failed to include language to the same effect in the automatic stay provisions. “ ‘Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.’ ” United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972), quoted with approval in Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 301, 78 L.Ed.2d 17 (1983). The cram-down provisions, therefore, strongly suggest that subsection (3) of § 361 was not intended to authorize present value payments to undersecured creditors to compensate for delay during the pendency of the reorganization proceeding.
B. The Missing Provisions — Necessity and Invention.
Those courts that have adopted the American Mariner approach and required postpetition interest payments to an un-dersecured creditor on the value of its collateral have been faced with numerous questions for which the Code provides no guidance.
Because the only support in the statute for the payment of interest, the phrase “indubitable equivalent,” does not even use the word “interest,” and because, some courts are understandably reluctant to speak in terms of interest in light of §§ 502, 506, which clearly preclude an un-dersecured creditor from receiving postpet-ition interest as part of its claim, many courts have latched onto the concept of compensating for “lost opportunity” through the adequate protection provisions. *1403 See supra note 1. Lost opportunity costs are said to be those amounts that an un-dersecured creditor would have earned if it had been permitted to foreclose on its collateral upon default, sell the collateral, and re-invest the proceeds, which the stay prevents. A formula for adequate protection is thus created, using at its base a hypothetical foreclosure and sale of actual collateral, and a hypothetical re-investment of the proceeds. The problem that courts have struggled with is that the Code provides no instructions on how to fill in the blanks in the formula, namely (1) whether to compensate for lost opportunity costs from the date of the petition, the date of the motion for relief from the stay, or the date of a ruling on the motion; (2) whether to take into account the practicalities of delay in the state foreclosure process and delay in selling the property in order to realize something more favorable than a forced-sale price, during which a creditor would not be able to invest proceeds from its collateral; (3) whether to apply to the hypothetically re-invested proceeds of sale the contract rate of interest, or the current market rate, and, in that case, the long-term or short-term market rate; and (4) whether to apply “lost opportunity cost” payments that are actually made to the principal amount of the debt. Necessity being the mother of invention, courts have invented answers. Not surprisingly, the answers have varied markedly.
The bankruptcy court in the instant case ordered that postpetition interest payments begin six months after the petition was filed, because the court found that there would be a six-month delay in realizing proceeds from a foreclosure and orderly sale of the property. 49 B.R. at 458. See also American Mariner, 734 F.2d at 435 n. 12 (“the timing of adequate protection should take account of the usual time and expense involved in repossession and sale of collateral”). But in Grundy National Bank, 754 F.2d at 1441, the Fourth Circuit held that “interest should not begin” until the filing of a motion for relief from the stay, rather than the date that the petition was filed, and “[e]ven then the timing of interest should be postponed to take account of the time that would be subsumed in repossession and sale of the collateral.” [42] The Code is silent on the issue.
The bankruptcy court in this case did not advert to the fact that the bankruptcy petition was filed on the eve of foreclosure, so that a portion of the six-month period had already elapsed. The court did acknowledge, and indeed recognized as a flaw, the fact that if the stay lifts at the end of the six-month period, the creditor will have to endure for a second time the six-month delay incident to foreclosure and sale, and is thus not actually compensated for lost opportunity. 49 B.R. at 458 n. 9. In effect, under this rule, the length of time that a debtor would have before adequate protection interest payments would commence would depend in part on foreclosure procedures in the forum state and in part on how long it would take the creditor to market the property in an orderly (non-forced sale) way, if the evidence establishes that the creditor would in fact market the collateral in that way. Nevertheless, the court determined that the rule, although “flawed,” is “reasonable,” because, in part, delay would further “the Congressional objective to promote reorganization.” Id. In so doing, the court made explicit what has perhaps been implicit in the decisions of numerous other courts engaged in determining when adequate protection interest payments should commence: the reorganization process will be aborted in a fashion inconsistent with the congressional objective of Chapter 11 to promote reorganization, if adequate protection interest payments commence immediately after the imposition of the stay, which is when opportunity costs begin to be incurred. These courts, in effect, compromise what are perceived to be conflicting requirements of the Code. By qualifying the creditor’s right to *1404 postpetition interest in various fashions, they are able to further the congressional goal of promoting reorganization. But there is something anomalous about applying in a free-floating manner, with markedly varying results, a rule that depends for its very existence on the rule in Murel Holding, which itself is absolutely rigid in its application, regardless of the consequences.
Courts have also struggled to set an appropriate rate of interest for the hypothetically re-invested proceeds. American Mariner fixed the rate at the lower of the “market rate” and the contract rate. 734 F.2d at 435 n. 12. Although perhaps fairer, this qualification makes little logical sense if § 361 was intended to fully protect a creditor’s “opportunity costs”; the rate should always be the market rate, which will rarely be the same as the contract rate, because the hypothetically foreclosing creditor could rarely re-invest the proceeds at the contract rate. The court in In re Victory Construction Co., 9 B.R. 570, 574 (Bankr.C.D.Cal.1981), “found” a rate of 18% to be appropriate without discussion, in a case where the contract rate was 8%. The bankruptcy court in the instant case determined 12% was “the applicable rate ... at the time that the creditor could expect to receive the foreclosure proceeds for reinvestment,” six months after the petition was filed, and “assume[d] stable interest rates” absent contrary evidence. 49 B.R. at 458. There seems to be little discussion of whether the rates awarded are for long- or short-term investments. Presumably the bankruptcy court would be obligated to take evidence on the normal investment practices of the creditor seeking relief, as well as the likelihood that interest rates might change if that creditor normally placed its funds in short-term investments, despite the summary nature of automatic stay litigation and the need for speed. Again, the Code offers no advice on the issue.
Another difficult question is how to treat “opportunity cost payments” in the event of a successful reorganization. Courts addressing the issue seem to be uncertain about what to do with “American Mariner interest.” See generally Fortgang & Mayer, Valuation in Bankruptcy, 32 U.C.L.A. L.Rev. 1061, 1088-90 (1985). The court in In re Alexander, 48 B.R. 110 (Bankr.W.D. Mo.1985), stated that “American Mariner interest” is “wholly separate” from contract interest and speculated that it “may or may not go to reduce the other forms of interest which are meantime building.” Id. at 119 n. 18.[43]
Finally, courts awarding “opportunity cost payments” will ultimately be forced to invent a refund procedure if a debtor is able to “cure” past defaults under § 1124(2). See Fortgang & Mayer, supra, 32 U.C.L.A.L.Rev. at 1089-90. That section allows a debtor upon proposal of a plan to cure defaults and reinstate the original terms of the loan, including the interest rate. In that event, the creditor is “unimpaired” and may not vote on the plan. If postpetition interest payments were ordered at a market rate higher than the contract rate, then a debtor who subsequently is able to “unimpair” the creditor under § 1124(2) presumably would be entitled to a refund of excess interest paid when the terms of the original loan are reinstated. No refund provision appears in the Code. “Aside from the administrative inconvenience of such a course, the need to invent a procedure is proof that Congress never contemplated opportunity cost as adequate protection in light of § 1124(2).” In re South Village, Inc., 25 B.R. at 998; see In re Manville Forest Products Corp., 43 B.R. 293, 301-02 & n. 7 (Bankr.S.D.N.Y. 1984) (§ 1124(2) cannot be reconciled with *1405 postpetition interest payments in the guise of adequate protection payments).[44]
In In re Victory Construction Co., 42 B.R. 145, 155-56 (Bankr.C.D.Cal.1984), the court directly faced the issue of how to treat American Mariner payments when a debtor cured past defaults under § 1124(2) and a plan was confirmed. The debtor had been making interim “adequate protection payments” at the market rate of 18% of the value of the collateral in return for the stay. The contract rate was 8%. The court recognized that “one’s first thought” would be to give to the debtor, and thereby other creditors, “the benefit of any excess over the contract rate” if a debtor is able to reinstate the original note. The court, however, had a second thought:
But I do not think that any principle compels this result. From the start, the payment was something other than compensation under the contract. Judge Or-din in Victory II expressly recognized that he was ordering a (supposed) market, rather than the contract, rate. The debtor has paid it on that basis — and with the recognition that he might never recover any of it at all. [The] debtor may have credit against his adequate protection payments for interest at the contract rate on his ongoing contract obligation, but ... the creditor may retain the balance.
Id. at 156 (emphasis added). In other words, the creditor received a temporary revision of its loan agreement to provide the higher market interest rate, simply because the debtor was in a reorganization proceeding. When the debtor cured past defaults and reinstated the original note, the creditor received precisely what it had bargained for. The “balance” that the court referred to clearly came from unencumbered assets that could have paid other creditors part of their principal. Although it is said that the purpose of the bankruptcy laws is not to rewrite deals for creditors to improve their investments, the Victory Construction ruling certainly had that effect.
C. Provisions Facilitating Speedy Proceedings.
The driving force behind the American Mariner line of cases is clearly the delay of the reorganization process, a delay necessitated by federal law which in effect imposes a monetary loss on all creditors. See Nicholas, 384 U.S. at 683, 86 S.Ct. at 1679. Although postpetition interest is not mandated by the Fifth Amendment, see Wright v. Union Central Life Insurance Co., 311 U.S. 273, 278, 61 S.Ct. 196, 199, 85 L.Ed. 184 (1940); Briggs, 780 F.2d at 1342; American Mariner, 734 F.2d at 434 n. 8 (“no such protection is constitutionally required”), courts that award postpetition interest to undersecured creditors seem to be motivated by considerations of fairness: those creditors should not be placed in the deep freeze for an unreasonable period without some compensation for the delay.
Indeed, as noted above, delay was an overriding concern of Congress in recodify-ing the adequate protection and reorganization provisions in 1978. Witness after witness complained that the cumbersome procedures under the Act and inattention by the courts to motions for relief from the stay led to delay that did not serve the purposes of the bankruptcy laws. Congress responded to the complaints with numerous provisions of the Code that were designed to encourage a more rapid resolution of reorganization proceedings. Various sections — including §§ 305(a) (permitting dismissal or suspension of proceedings if interests of creditors and debtor would be served, such as when a reorganization or arrangement has been or is being effected in another forum), 1102(b)(1) (permitting continuation of prepetition creditors’ committees), and 1126(b) (streamlining procedures for acceptance of plan, particularly *1406 prepetition solicitation of plan approval)— encourage speedy out-of-court workouts. Further, the debtor’s exclusive right to file a plan is limited to 120 days, § 1121(b), unless extended “for cause,” see House Report, supra, at 223, 231, and even the 120-day period may be reduced by the court “for cause,” § 1121(d). Thereafter, a creditor may file a plan, § 1121(c). A creditor may move to dismiss the petition or convert the proceeding to a Chapter 7 liquidation if the debtor is dilatory, § 1112; In re Shri-ver, 33 B.R. at 188, or may move for appointment of a trustee, § 1104(a).
Most important, Congress provided that motions for relief from the stay are entitled to priority: if the court does not act on a motion for relief from the stay within thirty days, the stay automatically lifts.[45] The 30-day rule is the “most direct attack on the problem of delay and dilatoriness in dealing with requests for relief from the stay.” Kennedy, Automatic Stay II, supra, 12 U.MichJ.L.Ref. at 40 n. 166. Further, relief from the stay is now sought by means of a motion, rather than by the commencement of an adversary proceeding in which complicated counterclaims and offsets were often raised, requiring time consuming procedures to adjudicate. The legislative history of § 362(e) makes clear that the brief time periods allowed in § 362 litigation and the use of a motions procedure were designed to streamline and speed up the process:
At the expedited hearing under subsection (e), and at all hearings on relief from the stay, the only issue will be the claim of the creditor and the lack of adequate protection or existence of other cause for relief from the stay. This hearing will not be the appropriate time at which to bring in other issues, such as counterclaims against the creditor on largely unrelated matters. Those counterclaims are not to be handled in the summary fashion that the preliminary hearing under this provision will be. Rather, they will be the subject of more complete proceedings by the trustees to recover property of the estate or to object to the allowance of a claim.
House Report, supra, at 344, U.S.Code Cong. & Admin.News 1978, p. 6300. See also 2 Collier on Bankruptcy 11362.08[3], at 362-63 (15th ed. 1985). Finally, § 362(d) motions require only limited notice to creditors.[46]
One conclusion from the legislative history is unassailable: Congress responded in 1978 to creditors’ complaints about delay. It expressly did so by streamlining the stay relief litigation procedure, by building into the Code assurance that requests for relief from the stay will be considered in a timely manner and by providing all creditors with numerous means of limiting the delay of the reorganization process.
If the American Mariner position is accepted and undersecured creditors are entitled to periodic postpetition interest payments, perhaps at a rate higher than the contract rate and which (according to some courts) need not be credited against principal, the end result may, in fact, be delay— *1407 contrary to Congress’ clearly expressed intent to speed up reorganization proceedings. There would be little economic incentive for the undersecured creditor, particularly one whose prospects for a significant distribution on the unsecured portion of its claim are not bright, to cooperate in developing a negotiated plan. In many cases, delay would have little adverse effect on the creditor, and, in fact, the creditor might be rewarded for delay if the court allowed it to retain without adjustment the amount of the American Mariner payments above interest due under the contract. That very delay, however, will almost certainly adversely affect the unsecured creditors, as it is often the unencumbered assets, otherwise available for distribution to unsecured creditors, that are funding the interest payments to the undersecured creditors.
A bankruptcy court, faced with a difficult and unpleasant decision whether, in effect, to terminate a reorganization case with bleak prospects for success, might well prefer to let the case continue and to assuage the undersecured creditor by ordering the payment of postpetition interest. But that very decision is a decision for delay and for increased expense, both in the form of interest and in the form of administrative expense, expense that in most cases will be funded by the unsecured creditors. A decision for delay — without a meaningful possibility that the delay will ultimately benefit creditors — is not the decision that Congress has made, and the obligation of the courts is to honor and effectuate the decisions that Congress has made to limit delay.
D. Interest Provisions — Procedure in § 506(b).
Awarding periodic postpetition interest payments to an undersecured creditor also seems inconsistent with the procedural mechanisms of §§ 506(b) and 506(c). Under § 506(c), the debtor may recover from property securing a creditor’s allowed secured claim the reasonable and necessary costs and expenses of preserving or disposing of the property, to the extent of any benefit to the creditor. If, after reducing the amount of the allowed secured claim by the amount of that recovery, the creditor is oversecured, it is entitled to interest at the contract rate on its net allowed secured claim. § 506(b). The timing of the payment of accrued interest to an oversecured creditor (at the conclusion of the proceeding) is doubtless based on the fact that it is not possible to compute the amount of § 506(c) recovery (and, accordingly, the amount of the net allowed secured claim on which interest is computed) until the termination of the proceeding.[47] Consider by contrast the happier lot of the underse-cured creditor under the American Mariner interpretation of § 361. Such a creditor is entitled to periodic interest payments on the value of its collateral, theoretically at the market rate (which may exceed the contract rate), without deduction for the § 506(c) recovery that cannot be computed until the termination of the proceeding. For example, in the case of collateral with a relatively short useful life and high costs of preserving the property, an underse-cured creditor may be considerably better off receiving postpetition interest payments at the market rate on the value of the collateral (even if valued on a liquidation *1408 basis), than an oversecured creditor which is able to collect interest at the contract rate at the conclusion of the proceeding on what may by that time be a substantially reduced net allowed secured claim. Such a result, certainly conceivable under American Mariner, seems unusual.
E. Compatibility of Periodic Postpetition Interest Payments with Policies of Bankruptcy Code.
Probably the most troubling aspects of a construction of § 361 that would require or allow periodic postpetition interest payments to undersecured creditors are: first, its impact on the orderly procedures for the distribution of the debtor’s estate either upon liquidation or reorganization; second, the resulting reallocation of the unencumbered assets of the debtor’s estate that frequently occurs shortly after the petition is filed; and third, the resulting reallocation of the risk of failure of the reorganization proceeding.
To understand all three aspects, it is useful to understand a typical secured financing arrangement. As was noted by Murphy in the law review article included in the record of the House hearings, see supra note 28, in many secured financing arrangements the scheduled principal payments approximate the depreciation of the collateral. Clearly, § 361(1) and (2) call for adequate protection payments to cover the decline in value caused by depreciation of the collateral. If § 361(3) is construed to further require postpetition interest payments on the value of the collateral, the total adequate protection payments will in many, perhaps most, cases approximate the principal and interest payments required by the existing terms of the secured debt instruments, because it will only be the interest on the unsecured portion of the secured debt that ceases to accrue. As Murphy pointed out, if the debtor could have made the principal and interest payments on its secured debt, it is unlikely that any proceeding would have been filed in the first place. In many Chapter 11 cases, including this one, the likely result of orders requiring periodic postpetition interest payments to undersecured creditors will be the immediate conversion to Chapter 7 — a result which seems inconsistent with the congressional policy favoring attempts at reorganization.[48]
Further, since an undersecured creditor will have no claim for postpetition interest at the conclusion of the proceeding, it will be necessary for each such creditor to file a motion for adequate protection under § 362 immediately after the petition is filed or it will lose interest until it does file. As a practical matter, this means that all potentially undersecured creditors in a reorganization proceeding will file § 362 motions shortly after the petition is filed,[49] and the *1409 debtor will be immediately faced with demands for adequate protection payments by its secured creditors which will often approximate the total principal and interest payments on secured debt which it was required to make before the petition was filed.
Against this factual background, we consider the objectives of the automatic stay. As was eloquently stated in the House Report on § 362:
The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.
The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor’s property. Those who acted first would obtain payment of the claim in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor’s assets prevents that.
House Report, supra, at 340, U.S.Code Cong. & Admin.News 1978, p. 6296. The scramble for the debtor’s unencumbered assets by its undersecured creditors, which the American Mariner case has precipitated, bears little resemblance to the breathing spell devoid of a “race of diligence” described in the House Report.
The key to achieving a fair and equitable distribution of the debtor’s assets contemplated by the House Report and by the Code, whether upon liquidation or reorganization, is complete information about the debtor’s assets, liabilities, past business and prospects. The debtor is required to file comprehensive schedules of creditors, assets and liabilities, current income and expenditures, and a statement of financial affairs, § 521(1), either with the petition or within 15 days thereafter, unless the time is extended for cause shown, Bankruptcy Rule 1007(c). In the usual case, a meeting of the debtor and its creditors must be held not less than 20 nor more than 40 days after the petition is filed, at which the debtor is examined under oath. Rule 2003. A committee of unsecured creditors is required to be appointed, and one or more committees of other creditors may be appointed to secure adequate representation of various creditor groups. § 1102(a). These committees participate in the investigation of the affairs of the debtor and in the formulation of a plan of reorganization. The purpose of the extensive information gathering that goes forward while the stay is pending is to put the debtor, its creditors and the court in a position to assess whether a plan of reorganization is feasible or desirable or whether the debtor must be liquidated. If the debtor or a creditor elects to go forward with a plan of reorganization, the Code provides a “carefully crafted scheme for creditor enfranchisement,” In re Braniff Airways, Inc., 700 F.2d 935, 940 (5th Cir.1983), including § 1125 disclosure requirements, § 1126 voting requirements, and § 1129(a)(7), the best interests of creditors test. Cf. In re Continental Air Lines, Inc., 780 F.2d 1223, 1226 (5th Cir.1986). Further, under § 1129(b)(2)(B), the absolute priority rule must be met in order for a plan of reorganization to be “fair and equitable,” a prerequisite to plan approval absent consent. That rule provides that claims and interests must participate in the plan “in complete recognition of their strict priorities, and unless the value of the debtor’s assets sup *1410 ports the extent of the participation afforded each class of claims or interests included in the plan,” the plan cannot be fair and equitable. 6A Collier on Bankruptcy II 11.06, at 210 (14th ed. 1977). See Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 527, 61 S.Ct. 675, 685, 85 L.Ed. 982 (1941); see also House Report, supra, at 415 (“[n]o class may be paid more than in full”). It seems obvious that the relative positions of creditors may be considered by the court, and the rule applied, only after the identity of each creditor, the amount owed and the extent to which the claim is secured or entitled to priority are known, not with precision, but at least with sufficient accuracy to assure that any proposed plan is feasible. Then, and only then, may the estate’s unencumbered assets be divided among the various classes of creditors in accordance with their respective priorities.
The information gathering and creditor enfranchisement processes described above, which are designed to achieve a fair and equitable distribution of the debtor’s assets, stand in sharp contrast to the abbreviated procedures which were established by Congress for the quick resolution of adequate protection motions. The speed, limited scope, and limited notice that are characteristics of a stay relief hearing strongly suggest that Congress did not intend the § 362 motion to be used as the vehicle for distributing unencumbered assets of the estate to the extent that would be required if adequate protection during the temporary pendency of the stay requires the complete compensation that is necessary for approval of a plan of reorganization contemplating deferred payments. Nor do those characteristics of a stay relief motion suggest that Congress intended that a series of § 362 motions filed by all the secured creditors in a case be disposi-tive of the outcome of the case with the frequency that is likely to occur if the debtor is compelled to make adequate protection interest payments approximating the total principal and interest payments on its secured debt. In summary, a construction of § 361(3) that would require interest payments to undersecured creditors seems inconsistent with the policy of the Code to promote an orderly distribution of the debt- or’s estate after a breathing spell designed to foster a careful assessment of the relative priorities of creditors and of the debt- or’s assets and prospects. Surely if Congress had intended to effect such fundamental changes in the way in which the automatic stay functions and in the way that the debtor’s assets are distributed, it would have indicated that decision with clarity.
Finally, the leading Supreme Court cases on postpetition interest, such as Vanston, “indicateQ that secured creditors must also share some of the risks of the rehabilitation process.” O’Toole, supra, 56 Am. Bankr.L.J. at 259. As things stood before American Mariner’s interpretation of the adequate protection provisions, each creditor — secured or unsecured — bore its own cost caused by the delay inherent in a bankruptcy proceeding. Even an overse-cured creditor, which is theoretically entitled to interest, in effect funded that interest out of the value of its collateral. Before American Mariner, therefore, the risk of failure of a reorganization proceeding was borne by all creditors. The effect of the American Mariner construction of the adequate protection provisions is most often to shift the costs associated with the delay in payment of the secured portion of an undersecured creditor’s claim to the unsecured creditors. Interestingly enough, an oversecured creditor continues to fund its own interest, and, of course, unsecured creditors not only fund their own delay costs, but also most often[50] fund those of *1411 undersecured creditors. With that decision to reallocate costs, there is a corresponding decision to reallocate the risk of failure of the reorganization proceedings. Surely if Congress had intended such a major change in the allocation of the risk of failure of reorganization proceedings to unsecured creditors, it would have so indicated with greater clarity in the Code itself or in the legislative history.
V.
As noted above, the Ninth Circuit in American Mariner[51] and the Fourth Circuit in Grundy National Bank[52] hold that the Code mandates postpetition interest payments to an undersecured creditor as a matter of law. Several bankruptcy courts and district courts,[53] as well as a few commentators,[54] agree. The Eighth Circuit[55] has concluded that an undersecured credi *1412 tor may be entitled to postpetition interest payments depending on the facts of the case, such as the “nature of the collateral and the proposed use of the collateral,” but that it is not so entitled as a matter of law.[56] Finally, numerous bankruptcy and district courts,[57] as well as the majority of commentators,[58] conclude that under no cir *1413 cumstances may a Chapter 11 court award postpetition interest to an undersecured creditor in the form of periodic cash payments for adequate protection under §§ 361-362(d)(l), or otherwise criticize American Mariner’s analysis.
The impact of American Mariner on this area of bankruptcy law is difficult to overstate. The decision has precipitated an avalanche of § 362(d) motions, see supra note 49, and, in many cases, has shifted the critical, indeed dispositive, point in the reorganization proceedings to a few weeks immediately following the filing of the petition. Because of the importance of American Mariner, we undertake a review of its analysis.
A primary difficulty with the opinion is that it does not allude to the only published portion of the legislative history explaining the versions of §§ 361-362(d)(l) as enacted, the explanations of Rep. Edwards and Sen. DeConcini that (i) § 361(3) was intended to permit “other forms of adequate protection” (emphasis added) than those set forth in §§ 361(1) and (2), and (ii) the adequate protection provisions only protect a creditor’s allowed secured claim, which cannot include postpetition interest for an underse-cured creditor.[59] Nor did the court refer to Rep. Butler’s explanation that adequate protection payments or relief from the automatic stay would be appropriate if a creditor is “concerned that property is being misused or depreciating.” Further, the court did not even cite, let alone reconcile its rule with, the Code’s interest provisions or the leading Supreme Court cases, including Vanston and Sexton. Indeed, although the issue was framed before the Bankruptcy Appeals Panel as whether “an under collateralized secured creditor [is] entitled to postpetition interest upon the value of its collateral as a condition of denying relief from the automatic stay,” 27 B.R. at 1005 (quoting brief of Crocker Na *1414 tional Bank at 2), the Ninth Circuit avoided the point.[60]
We have already discussed the “indubitable equivalent” language in § 361(3) and when it was inserted into the Code. American Mariner placed significant, almost controlling, weight on inclusion of the phrase,[61] referring at length to the meaning of the phrase as used in Murel Holding. The Ninth Circuit assumed that the phrase had independent content identical to that in Murel and required an award of interest payments during the stay. The court distinguished Mur el’s statement that “[n]o doubt less will be required to hold up the suit for a short time until the debtor shall have a chance to prepare” on the ground that “[t]his qualification, of course, reflects the absence of a statutory requirement for adequate protection during the stay, not to mention the absence of a requirement for an automatic stay,” 734 F.2d at 434. However, although there was no statutory requirement for adequate protection during the stay, the common law already had such a requirement.[62] In fact, Congress indicated that §§ 361-362(d)(l) essentially were intended to codify pre-Code law. Accordingly, the Ninth Circuit’s conclusion that “[t]he early cases, decided before enactment of the Bankruptcy Reform Act of 1978, are of little relevance in construing sections 361 and 362,” id. at 434, is difficult to square with settled rules of statutory construction.
The Ninth Circuit also placed significant weight on the language in the House Report that creditors should receive the “benefit of their bargain” despite the imposition of the automatic stay. The court implicitly assumed that the bargain that a creditor and debtor enter into included compensation for the delay in foreclosure necessitated by federal law. But it seems unlikely that a creditor bargains for compensation for delay necessitated solely by the time-consuming reorganization provisions of the Code, since that would require a conscious assumption that its borrower might file a bankruptcy petition.
Furthermore, the “bargain” which the creditor enters into incorporates the applicable requirements of federal bankruptcy law. Wright v. Union Central Life Insurance Co., 304 U.S. 502, 515, 58 S.Ct. 1025, 1032, 82 L.Ed. 1490 (1938) (“The mortgage contract was made subject to constitutional power in the Congress to legislate on the subject of bankruptcies. Impliedly, this was written into the contract between petitioner and respondent____”). Two aspects of the law, of course, are the automatic stay provision of § 362(a) and the interest provisions of § 502(b)(2) and § 506(b). The stay and the interest provisions themselves substantially alter the bargain of the parties.[63] The actual bargain struck, incorporating the interest provisions of the Code and nearly two centuries of its predeces-
*1415 Cite as 793 F.2d 1380 (5th Cir. 1986)
sors, is that if the creditor is undercollater-alized when the time comes to “carve up the bird,” the creditor will receive in respect of the secured portion of its debt only its “allowed secured claim”; it will not receive interest unmatured at the date of the bankruptcy filing. For this reason, using the “benefit of the bargain” language to support the payment of postpetition interest ignores what the parties actually understand to be the bargain. It also ignores the standard enforceability opinion by borrowers’ counsel, which qualifies the enforceability of the debt instrument with the “bankruptcy out”: the instrument will be enforceable “except as enforceability may be limited by bankruptcy, insolvency,
reorganization or similar laws affecting the rights of creditors generally.” Harter & Klee, supra, 48 Fordham L.Rev. at 277-78.
Further, it appears that the Ninth Circuit may have misinterpreted the compromise between the House and the Senate that led to the insertion of “indubitable equivalent” into the Code.[64] The Senate prevailed on the requirement in its version that a creditor not be forced to take a risk that its collateral would decline due to the penden-cy of the stay. There is simply not a hint in the remarks of Rep. Edwards that the compromise version significantly altered the scope of the interests to be protected set forth in each version of the legislation to that point.
*1416 Finally, as we have already discussed, American Mariner is marked by logical inconsistencies, most notably those in its footnote 12, in which it attempts to set guidelines for determining the amount of the payments. Although these guidelines and qualifications have the salutary effect of facilitating reorganizations, they make little logical sense if § 361 in fact protects and undersecured creditor’s “opportunity costs.”
To the extent that the Eighth Circuit’s opinion in Briggs follows American Mariner, it suffers from several of the same flaws. However, Briggs is far narrower than American Mariner. Briggs would require postpetition “interest” payments depending on the facts of the case, including the length of the stay, the “quality of the collateral,” whether the “collateral’s lien value is demonstrated to be appreciating, depreciating or remaining relatively stable,” and “whether taxes and other payments designed to keep the collateral free of statutory liens are being paid or will be paid by the debtor.” 780 F.2d at 1349. Of these factors, only the first, length of the stay, has anything whatever to do with accruing interest or “opportunity costs.” There can be no doubt that the other factors mentioned should be taken into account by any court making a § 362(d)(1) adequate protection determination.
The flexibility accorded to the bankruptcy court by Briggs is attractive to those who fear that American Mariner’s conclusion that undersecured creditors are entitled to postpetition interest payments as a matter of law will result in the wholesale, premature termination of Chapter 11 cases. Yet that very flexibility is difficult to reconcile with the language “indubitable equivalent” and with the inflexible requirement of complete compensation of Murel and the cram-down provision on which American Mariner is based. Further, the Eighth Circuit’s opinion in Briggs gives the bankruptcy courts very little guidance and likely will require several years of litigation at the bankruptcy and appellate court levels before the parameters of the rule announced in Briggs become clear.
VI.
We conclude that § 361(3) is designed to permit courts to grant “other relief,” in addition to that set forth in § 361(1) (cash payments) and § 361(2) (replacement liens), to protect a secured creditor against a decrease in the value of its collateral occasioned by the use, sale, or lease of its collateral by a debtor during the automatic stay, but only if the “other relief” will indubitably provide the creditor with the value lost. Section 361(3) does not require periodic postpetition interest payments to an undersecured creditor to compensate it for the delay of the reorganization proceeding during the pendency of the automatic stay.
The district court’s order insofar as it ordered Timbers to pay $7,956.00 monthly to the tax and insurance escrow is not challenged on appeal. The district court’s order is reversed to the extent that it ordered Timbers to pay $42,500 monthly for “adequate protection of foreclosure rights.” This matter is remanded to the district court for further proceedings not inconsistent with this opinion.
REVERSED AND REMANDED.

. Several commentators and courts seem to believe that by calling these proposed payments compensation for "lost opportunity,” they need not consider how to reconcile the payments with the interest provisions of the Bankruptcy Code of 1978, 11 U.S.C. §§ 502(b)(2), 506(b). However, "opportunity cost payments” are simply postpetition interest payments in sheep's clothing — "compensation allowed by law or fixed by the parties for the use or forbearance or detention of money,” Black’s Law Dictionary 729 (5th ed. 1979) — albeit on the value of the collateral rather than on the principal amount of the debt as called for by the contract. The first commentator to advance the notion, Patrick A. Murphy, expressly made the connection between these payments and interest: "If the interim cash payments alternative [of the adequate protection provision, 11 U.S.C. § 361] is used, perhaps the secured creditor should receive interest or compensation for its cost of funds.” Murphy, Use of Collateral in Business Rehabilitations: A Suggested Redrafting of Section 7-203 of the Bankruptcy Reform Act, 63 Calif.L.Rev. 1483, 1506 (1975). See also Yam-aka Motor Corp., U.S.A. v. Shadco, 762 F.2d 668, 670 (8th Cir.1985) (creditor "claims that it is entitled to post-petition interest on its claim as an element of ‘adequate protection”’); In re Briggs Transportation Co., 780 F.2d 1339, 1340 (8th Cir.1985); In re Pulliam, 54 B.R. 624, 625-26 (W.D.Mo.1985); In re Deeter, 53 B.R. 623, 629 (Bankr.N.D.Ind.1985) (payments for lost opportunity costs are "interest payments”); In re Va-nas, 50 B.R. 988, 993 (Bankr.E.D.Mich.1985) (creditor "contends that it is entitled to interest payments ad adequate protection for the delay in enforcing its right of foreclosure caused by the automatic stay”); In re Shriver, 33 B.R. 176, 185 (Bankr.N.D.Ohio 1983) (opportunity cost payment "permits the undersecured creditor to be paid interest and at the market rate not the contract rate’’); In re Monroe Park, 17 B.R. 934, 940 (D.Del.1982) (undersecured creditor entitled to “periodic cash payments ... as compensation for the accruing interest charges”); In re B & W Tractor Co., 38 B.R. 613, 617 (Bankr. E.D. N.C. 1984) (opportunity cost payments are postpetition interest payments); In re Alexander, 48 B.R. 110, 113 (Bankr.W.D.Mo. 1985) (secured creditor should receive interest for delay in enforcing its rights), cf. In re Nesmith, 57 B.R. 348, 394 (Bankr.E.D.Pa.1986) (interpreting American Mariner to hold that "the size of a secured lender’s debt ... includes interest on arrearages for purposes of deciding motion on relief from the automatic stay”).
Indeed, although the court in the leading case awarding such payments carefully avoided calling them interest payments, In re American Mariner Industries, Inc., 734 F.2d 426 (9th Cir. 1984), counsel for the secured creditor in that *1383 case framed the issue on appeal as whether "an undercollateralized secured creditor is entitled to post-petition interest upon the value of its collateral as a condition of denying relief from the automatic stay?” In re American Mariner Industries, Inc., 21 B.R. 1004, 1005 (Bankr.App. 9th Cir. 1983), rev’d, 734 F.2d 426 (9th Cir.1984). Murphy interprets American Mariner to hold that "an undersecured creditor is entitled to interest on the secured claim.” Murphy, Litigating Stays and Adequate Protection, in Secured Creditors and Lessors Under the Bankruptcy Reform Act 38 (PLI 1985) (emphasis added). See generally Epstein & Fuller, Chapters 11 and 13 of the Bankruptcy Code — Observations on Using Case Authority from One of the Chapters in Proceedings Under the Other, 38 Vand.L.Rev. 901, 914 (1985) (noting difficulty in distinguishing "opportunity costs" from postpetition interest).

. (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
(1) for cause, including the lack of adequate protection of an interest in property of such party in interest____

. See also United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 222, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952) (various sections of statute "must be read in relation to each other”); United States v. Boisdore's Heirs, 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1850) ("In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.”).

. 11U.S.C.§ 1111 (b)(2) gives a class of underse-cured creditors the option to elect treatment of their claims solely as secured claims. See generally Eisenberg, The Undersecured Creditor in Reorganizations and the Nature of Security, 38 Vand.L.Rev. 931 (1985).

. Put differently, the petition suspended the contract right to accrue interest; it did not extinguish the right. Nicholas, 384 U.S. at 682 n. 9, 86 S.Ct. at 1678-79 n. 9. Therefore, in certain circumstances, such as when a creditor was oversecured, interest continued to accrue. See O'Toole, Adequate Protection and Postpetition Interest in Chapter 11 -Proceedings, 56 Am.Bankr. L.J. 251, 254 (1982).

. The rule that disallowed postpetition interest is sometimes not applied where the collateral is itself income producing, e.g., debt or equity securities, and the interest or dividend earned is applied to interest accruing postpetition. Sexton, 219 U.S. at 346, 31 S.Ct. at 258; In re Black Ranches, Inc., 362 F.2d 8, 15 (8th Cir.), cert. denied, 385 U.S. 990, 87 S.Ct. 595, 17 L.Ed.2d 450 (1966). The rationale for this exception is as follows:
There is no more reason for allowing the bankrupt estate to profit by the delay beyond the date of settlement than there is for letting the creditor do so. Therefore to apply these subsequent dividends, & c., to subsequent interest seems just.
Sexton, 219 U.S. at 346, 31 S.Ct. at 258.

. See generally Georgia, F. & A. R. Co. v. Bankers Trust Co., 170 F.2d 733, 734 (5th Cir.1948); Oppenheimer v. Oldham, 178 F.2d 386, 388 (5th Cir. 1949) ("It has always been the rule in bankruptcy administration that the accrual of simple interest on unsecured claims runs only to the date of bankruptcy, and as held by most courts the same has been true of deficiently secured *1387 claims,” but interest may be permitted "on amply secured claims.”).
Congress eventually codified the prevailing rule in substantial part, and the interest provision of the Act in effect at the time the Code was under consideration was as follows:
Debts of the bankrupt may be proved and allowed against his estate which are founded upon (1) a fixed liability, as evidenced by a judgment or an instrument in writing, absolutely owing at the time of the filing of the petition by or against him, whether then payable or not, with any interest thereon which would have been recoverable at that date or with a rebate of interest upon such as were not then payable and did not bear interest.
11 U.S.C. § 103(a)(1) (1976) (repealed 1978).

. Postpetition interest rules enacted in 1978 were described in all applicable legislative materials as codifying "current law." S.Rep. No. 989, 95th Cong., 2d Sess. 63, 68 reprinted in 1978 U.S. Code Cong. & Ad. News 5787, 5849 (§ 506(b) “codifies current law” by giving "a creditor with an oversecured claim” interest "to the extent that the value of the collateral exceeds the amount of the underlying claim” [hereinafter cited as Senate Report ]; H.R.Rep No. 595, 95th Cong., 2d Sess. 356-57, reprinted in 1978 U.S. Code Cong. & Ad. News 5963, 6312 [hereinafter cited as House Report]. See also O'Toole, supra, 56 Am.Bankr. L.J. at 267 (Section 506(b) represents codification of Coder exception).

. Finally, in the rare case of liquidation of a solvent estate, an unsecured creditor may receive postpetition interest on an allowed claim. § 726(a)(4), (5).

. See also Senate Report, supra, at 49 (automatic stay "provides creditor protection,” preventing creditors from pursuing their own remedies); J. Trost, G. Treister, L. Forman, K. Klee, R. Levin, The New Federal Bankruptcy Code 91 (1979) (automatic stay is "essential in liquidation cases to enable the trustee to preserve the estate and to carry out his administrative duties”).

. See, e.g., In re Deeter, 53 B.R. 623, 626 (Bankr.N.D.Ind.1985) ("By using the indubitable equivalent language in § 361, it seems apparent that Congress envisioned compensation for the delay in exercising foreclosure rights as a part of adequate protection."). The meaning of "indubitable equivalent" is “[p]robably the most litigated issue in cases dealing with section 361.” W. Norton, 1984 Annual Survey of Bankruptcy Law 197.

. The authors of The New Federal Bankruptcy Code, supra, appear to agree with this interpretation of § 361:
We are told [by § 361] that "when adequate protection is required” it may be provided by cash payments, 11 U.S.C. § 361(1), additional collateral, 11 U.S.C. § 361(2), or any other method that will give to the secured party "the indubitable equivalent" of what might be lost by the continued use of his collateral.
Id. at 287 (emphasis added).

. See In re Sun Valley Ranches, Inc., 38 B.R. 595, 598 (Bankr.D.Idaho 1984) (“those courts holding opportunity cost or the time value of money is compensible as part of adequate protection place unjustified reliance on [Murel] and the incorporation of Judge Learned Hand’s metaphorical language in that case into § 361(3)”); In re Smithfield Estates, 48 B.R. 910, 914 n. 8 (Bankr.D.R.I.1985) ("same protection necessary to insure the creditor the benefit of his bargain upon confirmation of a plan should not be imposed for interim protection during the stay’’); In re Shriver, 33 B.R. 176, 183 (Bankr.N.D.Ohio 1983) (opportunity cost payments confuse adequate protection concept with cram-down requirements).

. In Wright v. Union Central Life Insurance Co., 304 U.S. 502, 58 S.Ct. 1025, 82 L.Ed. 1490 (1938), the Court discussed at length the relationship between Congress’ power to affect secured creditors’ interests and the limits on that power set forth in the Fifth Amendment:
The mortgage contract was made subject to constitutional power in the Congress to legislate on the subject of bankruptcies. Impliedly, this was written into the contract between petitioner and respondent____ And the fact that in this case the purchaser at the foreclosure sale was also the mortgagee is not a determining factor. Any purchaser at a judicial sale must purchase subject to the possibility of the exercise of the bankruptcy power in a manner consonant with the Fifth Amendment____
If the argument is that Congress has no power to alter property rights, because the regulation of rights in property is a matter reserved to the states, it is futile. Bankruptcy proceedings constantly modify and affect the property rights established by state law____
A court of bankruptcy may affect the interests of lienholders in many ways____ Despite the preemptory terms of a pledge, it may enjoin sale of the collateral, if it finds that the sale would hinder or delay preparation or consumation of a plan of reorganization. It may enjoin like actions by a mortgagee which would defeat the purpose of [section 75(5) ] to effect rehabilitation of the former mortgagor.
Id. at 515-18, 58 S.Ct. at 1032-34. In other words, the Fifth Amendment protects only the creditor’s rights "to the extent of the value of the property.” Wright v. Union Central Life Ins. Co., 311 U.S. 273, 278, 61 S.Ct. 196, 199, 85 L.Ed. 184 (1940). As Collier states: “[tjhis may well be the clearest statement of a [fifth amendment] right of a secured creditor, namely, to have the value of its secured position maintained throughout the proceeding. Thus an undersecured creditor is protected by the fifth amendment only to the extent of the value of his collateral rather than *1391 as to the amount of his total claim." 2 Collier on Bankruptcy fl 362.01, at 362-15 (15th ed. 1985). But see Rogers, The Impairment of Secured Creditor's Rights in Reorganization: A Study of the Relationship Between the Fifth Amendment and the Bankruptcy Clause, 96 Harv.L.Rev. 973 (1983) (fifth amendment does not limit prospective exercise of Congress’ bankruptcy power).
The Supreme Court in In re New Haven Inclusion Cases, 399 U.S. 392,- 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970), discussed the power of the bankruptcy court to approve a reorganization, and in the discussion referred to the relation between private property rights and the bankruptcy laws. The debtor’s secured creditors had claimed that the lengthy period necessitated for reorganization "greatly depressed the value of [their] interest.” Id. at 490, 90 S.Ct. at 2108. The Court stated:
We do not doubt that the time consumed in the course of the proceedings in the reorganization court has imposed a substantial loss upon the bondholders. But in the circumstances presented by this litigation we see no constitutional bar to that result. The rights of the bondholders are not absolute.
Id. at 491, 90 S.Ct. at 2109.

. In time, under both the common law and the Rules of Bankruptcy Procedure, stays became automatically effective upon the filing of the petition. See, e.g., Bankruptcy Rule 11-44.

. The court in Yale Express refused the secured creditor’s request for "rental payments" on the debtor’s continued use of the collateral, noting that such payments "would nullify the reorganization” due to the debtor’s inability to meet the payments. Id. at 992.

. Contingent on such payments, the court refused to lift the stay:
We are conscious of the deep concern of the manufacturing secured creditors that their security depreciate beyond adequate salvage, *1392 but we must balance that with the Congressional mandate to encourage attempts at corporate reorganization where there is a reasonable possibility of success.

Id.

. See generally Miller, The Automatic Stay in Chapter XI Cases — A Catalyst for Rehabilitation or an Abuse of Creditor’s Rights?, 94 Banking L.J. 676 (1977). Bankruptcy Rule ll-44(a) later made the stay automatic and ex parte upon the filing of the petition, despite the language of the Act.

. In Barth Equipment Co. v. Perlstein, 128 F.2d 253 (2d Cir.1942), the Chapter XI court considered an argument by an undersecured creditor that it was entitled to “a claim, as an expense of administration, for rental, or ‘use and occupancy,’ of the equipment during the period from August 1 [the date of the petition], when it first became entitled to reclaim the equipment, to October 27 [the date the proceedings were dismissed]. There was never any agreement between the parties to pay such rental, and the claim is based solely on the delay in returning the equipment.” Id. at 254. The court rejected the claim, stating that “the privilege of reclamation is not so absolute that its exercise may not be subjected to a reasonable delay.” Id. Had the creditor immediately seized the equipment and sold it, the equipment could not also have been rented to a third party; therefore the creditor was not entitled to rental payments. The only damages recoverable would be "a drop, if any, in the market value of the goods.” Id.

. See also Kennedy, Automatic Stays Under the New Bankruptcy Law, 12 U.MichJ.L.Ref. 1, 41 n. 169 (1978) (rule requiring precedence "frequently is not observed”).

. Section 7-203. Use of Property Leased or Subject to a Lien.
(b) Relief from or Modification of Stay. Pursuant to the Rules of Bankruptcy Procedure and section 4-501(c), a secured party or lessor may file a complaint (1) to terminate the stay, or (2) to modify the stay by imposing such conditions on the use of the property ... as will adequately protect the secured party. The trustee or debtor shall have the burden of proving that the value of the secured creditor's interest in the property ... as of the date of the petition is adequately protected.
Id. at 236.

. A detailed review of the enactment process of the Bankruptcy Reform Act is set forth by one of the principal drafters of the Code in Klee, Legislative History of the New Bankruptcy Law, 28 DePaul L.Rev. 941 (1979) [hereinafter cited as Legislative History], and by the Executive Director of the Bankruptcy Laws Commission, Kennedy, Foreword: A Brief History of the Bankruptcy Reform Act, 58 N.C.L.Rev. 667 (1980) [hereinafter cited as Brief History].

. Statements by a witness at a committee hearing may be relevant to a determination of congressional intent when the witness urges a change in a bill because of an assumed interpretation, or where witnesses "without contradiction" interpret the proposal in a particular way. Whiting Pools, 462 U.S. at 207 & n. 16.

. See, e.g., House Hearings, supra, at 1773 (testimony of Patrick A. Murphy) (automatic stay “is a real advantage”); id. at 435 (testimony of Peter F. Coogan) ("Any method that can be used to preserve the going concern value is likely to be a very substantial help to all of the creditors, as well as to the debtor. The interests are absolutely mutual in that respect.”). See Kennedy, Automatic Stay II, supra, 12 U.Mich.J.L.Ref. at 64 (pre-Code litigation “has not generated a demand that the automatic stay be eliminated in the overhaul" of bankruptcy laws).

. See also id. at 482 (testimony of Patrick A. Murphy) ("vital that the rehabilitation process could he fast and flexible enough so that debtors and creditors can look to a bankruptcy proceeding as something that can be accomplished within a matter of months, rather than years”); id. at 1834 (testimony of Carroll G. Moore, Chairman, National Commercial Finance Conference) (debtor may “drag[] the case out” to detriment of secured creditor); id. at 2095 (statement of Richard A. Levine, U.S. Department of Justice) (automatic stay, provision should be modified to "guarantee that prompt action will be taken” on motion for relief from stay).

. Id. at 1753 (statement of Robert J. Grimmig). A representative of the American Life Insurance Association reiterated this point:
ALIA believes such use of mortgaged or leased property and the proceeds should be made subject to mandatory safeguards similar to those indicated in the Third Avenue Transit case [198 F.2d 703 (2d Cir.1952) ]. The creditor or landlord should be compensated for the use or given other security of equivalent value or a priority claim against the estate in an amount equal to the economic decline in value of the property (provided it is clear the estate will have sufficient assets to satisfy such priority).
Id. at 1608-09 (statement of John J. Creedon) (emphasis added).
Numerous other witnesses repeated the point. See Senate Hearings, supra, at 508-09 (statement of National Commercial Finance Conference) (Code should provide for "[p]eriodic payments to the secured creditor or lessor of amounts sufficient to cover deterioration, consumption, depletion or depreciation resulting from use”); id. at 522 (statement of National Commercial Finance Conference) (secured creditor should receive periodic payments during pendency of stay “to cover depreciation of the property or wear and tear”); House Hearings, supra, at 494 (testimony of Patrick A. Murphy) (secured creditor should receive protection "sufficient to *1395 maintain the value of his position throughout the proceedings”); id. at 1023 (statement of American Bankers Ass’n) (supporting stay if “it is clear that the value of the secured creditor's claim against the collateral will be preserved"); id. at 1607 (statement of American Life Insurance Ass’n) (secured creditor should be “fully protected” against "economic decline in value of the property”); id. at 1832, 1834 (testimony of Leon S. Forman, National Bankruptcy Conference) ("If you are talking about equipment or real estate, if the debtor uses that, he is not going to do much harm. It is a fixed asset and it is going to be there for a long time. What the finance company is worried about is when he has cash, accounts receivable, and inventory as collateral.”).

. See House Hearings, supra, at 1928:
MR. KLEE [Subcommittee Associate Counsel]. Many representatives of secured creditors have also raised the point that section 7-203 should enumerate factors, many of which are specified in the Commission’s notes, in the statute to guide the Court in deciding when property could be used subject to a lien; would any of you gentlemen be opposed to enumerating such factors in the statute, in a precatory manner?
MR. ROCHELLE [National Bankruptcy Conference]. Assuming someone is smart enough to do it. There you really have a problem. Our feeling was, if I recall it correctly, that the matter should turn on the discretion of the court on a case-by-case basis. To endeav- or to set out criteria specifically might have a limiting effect on the court.
Id. See also id. at 1754 & n. 7 (statement of American Bankers Ass’n) ("suggested standards” set forth in Commission’s notes should be included "in the text of the statute’’); id. at 494-95 (testimony of Patrick A. Murphy) (section relating to adequate protection "should include specific alternatives set forth in the statute”).

. The only reference to the issue anywhere in the record is in two paragraphs of a law review article by Murphy that was included in the record as a general explanation of the automatic stay provisions under the Act:
Another possible condition for the continuation of the stay, one which the Commission failed to suggest, is to require the debtor to make interim cash payments to the creditor in an amount sufficient to compensate the creditor on a present basis for its anticipated loss. This was the approach adopted in In re Ber-mec Corp., and has been the basis of most of the settlements between secured creditors and trustees, receivers and debtors under the existing Bankruptcy Act. Despite the attraction of the interim cash payments alternative, it is deceptively simple in several respects. To begin with, most secured financing is sufficiently generous that the scheduled payments approximate the depreciation of the collateral. If the debtor could have made the scheduled payments, it is likely that no proceeding under the Bankruptcy Act would have been necessary in the first place. Second, the court must decide whether the size of the payments should be based on liquidation value of the collateral or its fair market value, fair equivalent value or some other standard. Since it is unlikely the valuation will be exact, it would seem preferable to err on the high side. No real harm is done if the payments are in excess of the amount necessary to protect the secured creditor since each payment increases the debtor’s equity in the collateral, which in turn benefits general creditors. Third, if the interim cash payments alternative is used, perhaps the secured creditor should receive interest or compensation for its cost of funds.
This last idea may seem shocking at first because it has been long recognized in bankruptcy that a secured creditor is entitled to the payment of interest only in the event that it holds surplus security above the amount necessary to cover principal. If there is extra security, the rights of the secured creditor are not being jeopardized and interim payments are unnecessary. Nevertheless, the secured creditor in effect receives interest under the present Bankruptcy Act when the debtor in a Chapter XI proceeding just continues to pay his security obligations substantially according to their terms or works out an alternative payment schedule. If the stay of the marginally secured creditor is properly viewed as an involuntary loan of property to the debtor, there seems little reason not to afford the secured creditor some protection against the ravages of inflation and the fact that his own creditors have not given him an interest moratorium.
Murphy, supra, 63 Calif.L.Rev. at 1505-06 (emphasis added), reprinted in House Hearings, su *1396 pra, at 1798-99. Murphy did not raise the idea with the committee in his lengthy testimony, nor did committee members question him about it.

. Paragraph (4) "also defines, more clearly than the others, the general concept of adequate protection, by requiring such relief as will result in the realization of value. It is the general category, and as such, is defined by the concept involved rather than any particular method of adequate protection.” Id. In light of the dependence of the first three paragraphs on a decline in the value of the collateral, contemporary commentators suggested that subsection (4) simply was intended to allow alternate means of providing adequate protection. See Trost & King, Congress and Bankruptcy Reform Circa 1977, 33 Bus.Law. 489, 543 (1978) (§ 361 of H.R. 8200 "provides that ‘[w]hen adequate protection is required’ under the Act, adequate protection is to be provided whenever there is a 'decrease in the value of [the secured party’s] interest' ”).

. The House bill apparently acceded to the complaint of secured creditors that “value” for purposes of § 361 determinations should not always be “liquidation value," as the Commission had recommended. However, it did not adopt the creditors’ recommendation that “fully going concern value” be applied in each case. Rather, the bill avoided defining "value,” and stated that the determination "must be based on equitable considerations based on the facts of the case.” Id. at 339, U.S.Code Cong. & Admin. News 1978, p. 6295. In so doing, some commentators state that the Report "leaves the measure of ‘realization of value’ in a state of total confusion." Moller & Foltz, Chapter 11 of the New Bankruptcy Code, 58 N.C.L.Rev. 881, 900 (1980).

. The Senate bill "reflect[ed] a fear that any method” of protecting against economic depreciation other than periodic cash payments or a replacement lien on unencumbered property “would result in an increased risk to secured creditors." Downey, Ferriell & Pfieffer, The Proposed Bankruptcy Reorganization Provisions: A Comparison of the Current Law with Chapter 11 of H.R. 8200 and S. 2266, 18 Santa Clara L.Rev. 567, 588 (1978).

. See Klee, Legislative History, supra, 28 De-Paul L.Rev. at 954 (“It was readily apparent that a House-Senate conference would not be fruitful because the crucial compromises to be reached would not be within the scope of the differences between the House and Senate versions of the bill.”).

. The report of a conference committee is important to a determination of congressional intent, Gemsco, Inc. v. Walling, 324 U.S. 244, 264, 65 S.Ct. 605, 616, 89 L.Ed. 921 (1945), and "[bjecause the conference report represents the final statement of terms agreed to by both houses, next to the statute itself it is the most persuasive evidence of Congressional intent.” Demby v. Schweiker, 671 F.2d 507, 510 (D.C.Cir. 1981) (opinion of MacKinnon, J.).

. Fortgang and King continue: “The House and Senate committee reports accompanying the Code make clear that this provision requires disallowance of interest unmatured at the date of the filing of the petition____” Id.

. See In re Keller, 45 B.R. 469, 472-73 (Bankr. N.D.Iowa 1984) (adequate protection relates to the allowed secured claim and a secured creditor "will have an allowed secured claim to the extent of the value of the property securing its notes"); In re Shriver, 33 B.R. 176, 181 (Bankr. N.D.Ohio 1983) (“The ‘interest in property’ entitled to adequate protection under § 362(d)(1) then is the creditor’s allowed secured claims.”).

. See also Comment, Automatic Stay Under the 1978 Bankruptcy Code: An Equitable Roadblock to Secured Creditor Relief, 17 San Diego L.Rev. 1113, 1129 (1980) [hereinafter cited as Equitable Roadblock ]:
The first step in discerning whether the creditor’s interest is adequately protected is to determine the value of the secured creditor’s interest. This value is the amount of the debt plus any interest and expenses that would normally be added thereto. The creditor’s right to adequate protection is limited to the lesser of the value of the collateral or the amount of the secured claim.

Id.

. Adoption and rejection of amendments are “readily available extrinsic aids to the interpretation of statutes.” 2A Sutherland Statutory Construction, supra, at 341. However, “[unexplained changes made in a committee are not reliable indications of congressional intent." Drummond Coal Co. v. Watt, 735 F.2d 469, 474 (11th Cir.1984). As the Court explained in Trailmobile Co. v. Whirls, 331 U.S. 40, 67 S.Ct. 982, 91 L.Ed. 1328 (1947), "[t]he interpretation of statutes cannot safely be made to rest upon mute intermediate legislative maneuvers.” Id. at 61, 67 S.Ct. at 992. The Court in Watt v. Alaska, 451 U.S. 259, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981), recently applied this principle. The Court construed an amendment to a statute that was effected without explanation. The plain meaning of the amendment would have sharply altered existing law. The Court determined that Congress’ “silence" on the change was suggestive because “Congress might be expected to have mentioned a change wrought through the amendment which would” effect a major change in the law. It added that although "[tjhe silence of Congress may provide a treacherous *1401 guide to its intent[,] Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 11 [62 S.Ct. 875, 880, 86 L.Ed. 1229] (1942)," it would be "almost inconceivable that Congress knowingly would have changed substantially a long-standing formula ... without a word of comment." Watt v. Alaska, 451 U.S. at 271 n. 13, 101 S.Ct. at 1680 n. 13.

. The author of Comment, Compensation for Time Value as Part of Adequate Protection During the Automatic Stay, 50 U.Chi.L.Rev. 305 (1983) [hereinafter cited as Compensation for Time Value ], infers from the Senate’s refusal to adopt In re Yale Express "that Congress chose not to impose the risk of the failure of reorganization on secured creditors.” Id. at 313 (emphasis added). That conclusion is too broad: Congress’ refusal to subject secured creditors to the very risky In re Yale Express does not necessarily mean that Congress intended to place no risk on them. There are many grades of risk.

. Professor Kennedy, Executive Director of the Commission, stated that the "provisions for stays in the new law follow recommendations of the Commission." Kennedy, Automatic Stay II, supra, 12 U.Mich.J.L.Ref. at 5. See Nimmer, supra, 68 Minn.L.Rev. at 8 ("recoverable value approach to adequate protection is further suggested by earlier drafts of the current Code”).

. See also Staff of House Subcomm. on Civil and Constitutional Rights, Comm, on the Judiciary, 95th Cong., 1st Sess., Table of Derivation of H.R. 8200 5 (Comm. Print No. 6, 1977) (§ 361 derived from automatic stay provisions of Rules of Bankruptcy Procedure); The New Federal Bankruptcy Code, supra, at 93 (automatic stay and adequate protection provisions "were derived from the current Rules of Bankruptcy Procedure”).

. See Klee, Cram Down, supra, 53 Am.Bankr. L.J. at 155 n. 140 ("the provision that value is measured as of the effective date of the plan requires all payments to be discounted to the date using a present value analysis”); House Report, supra, at 413 (in connection with cram-down "[t]he property is to be valued as of the effective date of the plan, thus recognizing the time-value of money").

. The bankruptcy court noted the tension between the Ninth and Fourth Circuits on this Issue. 49 B.R. at 458 nn. 9-11.

. The court continued:
If the creditor is oversecured and the arrear-age is significant, it is obvious that the "loss of use” payments imposed by American Mariner may only diminish the additional interest charge for delay in payments and do little or nothing to deter the continual buildup of regular contract interest.
Id. In other words, the creditor would get interest on interest.

. See also Jackson, Bankruptcy, Non-Bankruptcy Entitlements and the Creditor’s Bargain, 91 Yale L.J. 857, 879 n. 101 (1982) (principle of Code that the advent of bankruptcy process is not a proper occasion for the assertion of greater rights than previously existed against the debtor "clearly is at odds with” recognizing these non-bankruptcy creditors’ rights under state law within the bankruptcy process).

. The stay automatically lifts 30 days after a § 362(d) motion is filed, unless the court after a preliminary hearing orders otherwise pending a final hearing, which must be commenced within 30 days of the preliminary hearing. § 362(e). The stay expires 30 days after the final hearing is commenced unless within that time the court denies the motion for relief from the stay or orders the stay continued pending conclusion of the final hearing.

. The notice required for a § 362 motion is limited by local rule in the Southern District of Texas. The motion need be served only on: (1) the debtor; (2) the unsecured creditors' committee, if one has been appointed or elected; (3) all holders of liens on the property as to which relief from the stay is sought, "as scheduled by the debtor or otherwise known to the movant”; and (4) the twenty largest unsecured creditors. Local Rule 4001(a)(4) (effective Jan. 1, 1985). This requirement recognizes that other creditors may have an interest in the resolution of a § 362 motion. When a motion for relief from the stay is filed within a few days of the date that the petition was filed, before lists of creditors were or were required to be filed by the debtor, and before a creditors’ committee is appointed, there is a real possibility that only the debtor will be aware of the motion and its potentially significant impact on other secured creditors and unsecured creditors.

. O'Toole, supra, 56 Am.Bankr.LJ. at 266 (“a secured creditor may never have an allowed secured claim for postpetition interest under section 506(a) until after the trustee or debtor in possession has finished preserving or disposing of the collateral”).
The author concludes:
In other words, section 506(b) is a timing provision. The Code denies the allowance of any claim for postpetition interest until after the plan is confirmed or the trustee disposes of the property. Section 506(b) directs the allowance of postpetition interest to the se-
cured creditor only if the creditor is overse-cured after the trustee has been compensated for the categories of expenses enumerated in section 506(c). Those expenses are the costs of preserving or disposing of the collateral to the extent the secured creditor is benefitted. It is impossible to determine the amount of the expenses the trustee has incurred until he has incurred them, and until the expenses have been incurred, section 506(b) forbids the allowance of postpetition interest.
Id. at 266-67.

. See In re Keller, 45 B.R. 469, 473 (Bankr.N.D. Iowa 1984) ("to follow the ninth circuit would in essence eviscerate the Bankruptcy Code and make Chapter 11 reorganization virtually impossible to accomplish”); In re Wolsky, 53 B.R. 751, 755 (Bankr.D.N.D.1985) (American Mariner will have "destructive effect” on agricultural reorganizations). This conclusion recognizes that the reorganization proceeding could not continue after the unencumbered assets of the estate that were being used to fund the payments were exhausted, thereby requiring that the stay be lifted due to an inability to make further adequate protection payments.

. Under American Mariner a substantial increase in the number of § 362 motions would be expected. In fact, statistics on § 362 motions filed in the Bankruptcy Court for the Southern District of Texas bear this out. As an initial matter, we note that the District Court Clerk's office does not maintain statistics on the number of § 362 motions filed in cases under each of Chapters 7, 11 and 13. However, because substantially all those motions are filed in cases under Chapters 11 and 13, the following statistics on the number of § 362 motions filed during August 1983 through March 1986 treat all such motions as having been filed in cases under Chapters 11 and 13. In the last five months of 1983, 1175 § 362 motions were filed, as compared with 1273 new Chapter 11 and 13 cases; that is equivalent to a rate of 92 motions for relief from the stay per 100 new cases. In 1984, the year that American Mariner was decided, 4392 motions for relief from the stay were filed, as against 3239 new filings, or a rate of 135 motions per 100 new cases. In 1985, the rate increased further, to 151 motions per 100 new cases (6408 motions, 4234 new cases). In the first three months of 1986, the rate grew to 163 motions for relief from the stay per 100 new *1409 cases (2375 motions, 1457 new cases). Creditors filed an average of 235 motions for relief from the stay per month in the last five months of 1983; they filed an average of 792 such motions per month in the first three months of 1986, an increase of 237%. New Chapter 11 and 13 filings were 90% higher in the first three months of 1986 than in the last five months of 1983. Many more § 362 motions are filed today than in years past, and these statistics make it clear that the increase is not due simply to an increase in new bankruptcy filings.

. In the single asset case sub judice, in which the undersecured creditor is secured not only by real estate but also by an assignment of the rents, postpetition interest is to be paid, under the terms of the bankruptcy court's order, not out of unencumbered assets (there are none) but out of the collateral (i.e., rents) securing the debt, although the debtor’s obligation to pay the interest is not limited to the rents. This anomalous situation, in which "adequate protection” for the undersecured party’s collateral is provided by consuming that collateral, contrasts with *1411 the lot of the oversecured creditor that, under the Code, cannot obtain adequate protection in the form of postpetition interest during the pendency of the case, but must wait until the end when it too is funded out of the collateral. Under the terms of an agreed cash collateral order currently in effect between Timbers and United, the net rents are being applied each month to debt service, presumably (although the record indicates some confusion on this point) to reduce United's debt. See supra Part II.A. The bankruptcy court’s adequate protection order would, in theory, reclassify those payments from debt reduction to interest. However, since the net rents would be inadequate to make the required postpetition interest payments in full, the practical effect of the adequate protection order is simply to lift the stay.

. In re American Mariner Industries, Inc., 734 F.2d 426 (9th Cir.1984).

. Grundy National Bank v. Tandem Mining Corp., 754 F.2d 1436 (4th Cir. 1985).

. The first post-Code court to raise the theory was In re Anchorage Boat Sales, Inc., 4 B.R. 635 (Bankr.E.D.N.Y.1980), which held that an un-dersecured creditor had "no right” to postpetition interest, but did have a right to the "present value” of its collateral due to “an undue risk of harm from the continuation of the stay” due to the debtor's commingling proceeds of the collateral. Id. at 642-43. Although the ruling appears to have been based on the depreciation and loss of the security due to the debtor's commingling funds, its use of the “present value” phrase has been cited as support for awarding postpetition interest payments. In In re Virginia Foundry Co., 9 B.R. 493 (W.D.Va.1981), the court expressly stated, without citation to authority, that the stay should be lifted because if the creditor foreclosed immediately, it would be able to invest the proceeds at the market rate, and that was part of a demand secured note entitled to adequate protection. Id. at 498. The court did not state whether the creditor was over — -or undersecured, and did not discuss the Code’s interest provisions. In re Monroe Park, 17 B.R. 934 (D.Del.1982), was the first case to require that an undersecured creditor receive postpetition interest for the "delay [] in realizing the value of its interest by virtue of the automat-
ic stay____” Id. at 940. It also did not mention the interest provisions. In re Langley, 30 B.R. 595 (N.D.Ind.1983), has been cited as authority for awarding monthly postpetition interest payments to undersecured creditors, but that case involved a marginally oversecured creditor.
Since the Ninth Circuit decided American Mariner in 1984, several lower courts have adopted its theory, most in express reliance on American Mariner without further analysis. See In re Western Preferred Corp., 58 B.R. 201, 210 (Bankr.N.D.Tex.1985); In re Leavell, 56 B.R. 11, 13 (Bankr.S.D.Ill. 1985); In re Vanas, 50 B.R. 988, 998-99 (Bankr.E.D.Mich.1985); In re Alexander, 48 B.R. 110, 119 & n. 18 (Bankr.W.D.Mo. 1985); In re Pulliam, 54 B.R. 624, 625-26 (W.D. Mo. 1985); In re Landsea Marketing, Inc., 53 B.R. 436, 437 (Bankr.C.D.Cal.1985); In re Wolsky, 53 B.R. 751, 755 (Bankr.D.N.D.1985); In re Woodland Hills Village Development Corp., 54 B.R. 77, 78 (Bankr.D.Md.1985); In reDeeter, 53 B.R. 623, 626-27 (Bankr.N.D.Ind.1985); In re Independence Village, Inc., 52 B.R. 715, 727 (Bankr.E.D. Mich.1985); In re Cash Currency Exchange, Inc., 52 B.R. 577, 580 (Bankr.N.D.Ill.1985); In re Lilyerd, 49 B.R. 109, 117 (D.Minn.1985); First National Bank of Miller v. Wieseler, 45 B.R. 871, 875 (D.S.D.1985) (motion to use proceeds); In re Air Vermont, Inc., 45 B.R. 931, 935 (Bankr.D.Vt. 1985); In re Levine, 45 B.R. 333, 338 n. 8 (N.D. 111.1984); In re Mary Harpley Builder, INc., 44 B.R. 151, 156 (Bankr.N.D.Ohio 1984). Many of these cases, of course, arose in the Ninth and Fourth Circuits, where American Mariner and Grundy are binding precedent.

. The American Mariner rule has attracted little support in scholarly writings. Periodic post-petition interest payments were first proposed by Patrick A. Murphy in 1975. Murphy, supra, 63 Calif.L.Rev. at 1506. Professor Thomas Jackson expanded on the proposal in Bankruptcy, Non-Bankruptcy Entitlements, and the Creditor's Bargain, 91 Yale L.J. 857, 874-75 & n. 80 (1982). See also Baird & Jackson, Corporate Reorganizations and the Treatment of Diverse Ownership Interests: A Comment on Adequate Protection of Secured Creditors in Bankruptcy, 51 U.Chi.L. Rev. 97, 102 (1984); cf. Comment, Good Faith Inquiries Under the Bankruptcy Code: Treating the Symptom, Not the Cause, 52 U.Chi.L.Rev. *1412 795, 814-16 (1985). The leading proponent of this view, Professor Jackson, has not attempted in his published writings to reconcile his interpretation of the adequate protection provisions of the Code with the Code’s language and legislative history. See Baird & Jackson, supra, 51 U.Chi.L.Rev. at 99. Indeed, in Bankruptcy, Non-Bankruptcy Entitlements, and the Creditor’s Bargain, Professor Jackson recognized that his model suffers from "inadequate statutory firmness that permits — perhaps nurtures — the belief among bankruptcy judges that adequate protection can be granted without reliance on market-pricing mechanisms.” 91 Yale LJ. at 877. Professor Jackson filed an amicus brief in the American Mariner case.
One commentator who appears to support American Mariner is Molbert, Adequate Protection for the Undersecured Creditor in a Chapter 11 Reorganization: Compensation for the Delay in Enforcing Foreclosure Rights, 60 No.Dak.L. Rev. 515, 529 (1984), who concludes that interest payments must be given for any period beyond 120 days of the date that the petition was filed due to the “equities” of the reorganization process.
Essentially the only writer to attempt to harmonize the proposal with the Code and its legislative history was the student author of Comment, Compensation for Time Value, supra, 50 U.Chi.L.Rev. at 309-22, who admitted that ”[t]he legislative history does not specifically address whether adequate protection must include time value compensation." Id. at 311 n. 25. In sum, the view of most commentators is that there is a “paucity of support [for this approach] within the Code and its legislative history.” Nimmer, supra, 68 Minn.L.Rev. at 10.

. In re Briggs Transportation Co., 780 F.2d 1339, 1347-49 (8th Cir.1985). Factors that the court suggested be taken into account include the length of the stay, whether the collateral was depreciating, whether taxes were being paid so as to keep the property free of statutory liens, and the likelihood of successful reorganization. Id. at 1349.

. A handful of lower courts agree with this approach. In re Peach State Distributing Co., 58 B.R. 873, 875-76 (Bankr.N.D.Ga.1986) (court is "more inclined” to award "opportunity costs” in cases with low likelihood of successful reorganization, but such payments are not required as a matter of law); InreB & W Tractor Co., 38 B.R. 613, 618 (Bankr.E.D.N.C.1984); In re First Century Trust Co., 12 B.R. 204, 208 (Bankr.W.D. Tenn.1981); General Motors Acceptance Corp. v. Anderson, 6 B.R. 601, 610 (Bankr.S.D.Ohio 1980). A detailed commentary in support of this approach is set forth in Nimmer, supra, 68 Minn.L.Rev. at 2 (loss of recoverable value is “baseline consideration" in adequate protection determination, and further protection may be appropriate depending on "the nature and history of the loan transaction, the behavior of the parties, and the prospects of or activity toward reorganization”).

. The great majority of lower courts that considered the issue prior to American Mariner, and several after it, held that a secured creditor is entitled only to protection against a decline in the value of its collateral through use, decay or depreciation. The leading cases in favor of this view are those of Judge Mabey in In re South Village, Inc., 25 B.R. 987 (Bankr.D.Utah 1982), and In re Alyucan Interstate Corp., 12 B.R. 803 (Bankr.D.Utah 1981). For other cases holding that §§ 361-362 protect only against depreciation in the collateral, see In re Smithfield Estates, Inc., 48 B.R. 910, 914 (Bankr.D.R.1.1985); In re Sun Valley Ranches, Inc., 38 B.R. 595, 598 (Bankr.D.Idaho 1984); In re Keller, 45 B.R. 469, 473 (Bankr.N.D.Iowa 1984); In re IKS. Sheppley & Co., 45 B.R. 473, 480 (Bankr.N.D.Iowa 1984); In re Cantrup, 32 B.R. 1004, 1005 (Bankr.D.Colo. 1983); In re Shriver, 33 B.R. 176, 183 (Bankr.N. D.Ohio 1983); In re Pine Lake Village Apartment Co., 19 B.R. 819, 827 (Bankr.S.D.N.Y.1982); In re Rameo Well Service, Inc., 32 B.R. 525, 531 (W.D.Okla.1983); In re Saypol, 31 B.R. 796, 800 (S.D.N.Y.1983); In re Aegean Fare, Inc., 34 B.R. 965 (Bankr.D.Mass.1983); In re Wheeler, 12 B.R. 908, 909-10 (Bankr.D.Mass.1981); In re Bom, 10 B.R. 43, 48 (Bankr.S.D.Tex.1981) (Patton, J.) (adequate protection assures creditor that “he will not be faced with a decrease in the value of his collateral" during the pendency of the automatic stay); In re Nixon Mach. Co., 9 B.R. 316, 317-18 (Bankr.E.D.Tenn.1981); cf. In re Man-ville Forest Products Corp., 43 B.R. 293, 302 n. 7 (Bankr.S.D.N.Y.1984) (stating in § 1124 proceeding that opportunity cost payments are "inappropriate and of dubious universal application [at] this early triage stage”).

. See O’Toole, supra, 56 Am.Bankr.L.J. at 263 (§ 361 requires adequate protection only against decrease in value of collateral); Rogers, supra, 96 Harv.L.Rev. at 995-96; Price, Adequate Protection Under the Bankmptcy Act of 1978, 71 Ky.L.J. 727, 734 (1983) (“The thrust of the adequate protection requirement is to assure maintenance of the value of the lien.”).
The author of Note, Adequate Protection Becomes a Creditor’s Tool: In re American Mariner Industries, Inc., supra, challenged the analysis of § 361’s legislative history set forth in American *1413 Mariner, 21 Willamette L.Rev. at 158-65. In Fortgang & Mayer, supra, 32 U.C.L.A.L.Rev. at 1075, the authors note numerous practical difficulties and logical inconsistencies in American Mariner, and labeled its reading of § 361 "somewhat disingenuous," id. at 1072 n. 49. Epstein & Fuller, supra, 38 Vand.L.Rev. at 913-15, note numerous analytical difficulties with American Mariner, most importantly its failure to distinguish "opportunity costs” from postpetition interest.
Other writings published shortly after enactment of the Code state that by § 361 Congress meant to protect against only a decline in value of collateral. Fortgang & King, supra, 56 N.Y. U.L.Rev. at 1154-56; Note, Equitable Roadblock, supra, 17 San Diego L.Rev. at 1132; Massari, Adequate Protection Under the Bankruptcy Reform Act, in W. Norton, 1978 Annual Survey of Bankruptcy Law 171, 173 ("Section 361 is designed to prevent loss or diminution of assets.”); Barbee, Business Reorganization Practice Under the Bankruptcy Reform Act of 1978, 28 Emory LJ. 709, 726-27 (1979) (“purpose of ‘adequate protection' is only to preserve a creditor’s position at the time of initiation of the proceeding ...; [i]f the value of a creditor's collateral will be eroded during the proceeding, that creditor ... is entitled to protection from such erosion or to foreclose upon its collateral”). See abo Axe, Penetrating the Iron Curtain: Representing Secured Creditors in Chapter 11 Reorganization Proceedings, 67 Marq.L.Rev. 421, 430-31 (1984) (concept of adequate protection "means that regardless of whether the secured creditor is un-dersecured or ovérsecured on the date of filing, its position should not deteriorate simply because the automatic stay is imposed, such that he suffers a loss of property or the benefit of his bargain”).

. Only those statements refer to §§ 361-362(d)(1) as enacted. "Every other source ... interprets an earlier version of the final legislative product.” Klee, Legblative Hbtory, supra, 28 DePaul L.Rev. at 957-58.
The court in American Mariner did cite one aspect of a floor statement by Rep. Edwards, but its citation is not particularly helpful. In support of its conclusion that "Sections 361 and 362 include exceptional provisions specifically intended by Congress to benefit secured creditors at the expense of the debtor,” 734 F.2d at 431, the court referred to a statement by Rep. Edwards " ‘that creditors were not getting enough money out of bankruptcy proceedings to make it worth their while to participate in attempting to recover their money.’ ” Id. at 431 n. 6 (quoting 123 Cong.Rec. 35,446 (1977)). Rep. Edwards’ quote, however, was taken out of context. The statement had nothing to do with adequate protection or periodic postpetition interest payments. Rather, it concerned administrative difficulties, most notably "professional administrators who do not act for the benefit of creditors.” 123 Cong.Rec. 35,446 (1977) (remarks of Rep. Edwards).

. The court in In re Rankin, 49 B.R. 565 (Bankr.W.D.Mo.1985), set forth its remarkable view of the relation between the interest provisions and the adequate protection provisions when it ordered "American Mariner" interest to be paid:
Under § 506(b) of the Code, an undersecured creditor, as here, is not entitled to accrue interest after the date of the filing. Thus interest may not be awarded as interest but the same amount may be awarded in another guise.
Id. at 569 (emphasis added). Courts that have refused to award postpetition interest to an un-dersecured creditor, on the other hand, consistently note the direct conflict of the secured creditor's argument and the interest provisions. See, e.g., In re Pine Lake Village Apartment Co., 19 B.R. at 827; In re South Village, Inc., 25 B.R. at 997; In re Shriver, 33 B.R. at 185.

. "After examining the origins of the phrase and its use elsewhere in the Bankruptcy Code, we conclude that it at least encourages if not requires a present value analysis under section 361.” 734 F.2d at 432.

. See supra notes 14-20 and accompanying text.

. "[I]t is artificial to speak of a ‘bargain’ in bankruptcy, when the law has intervened to change the contract made between debtor and creditor in many ways.” O’Toole, supra, 56 Am.Bankr.LJ. at 273. See Harter & Klee, The Impact of the New Bankruptcy Code on the "Bankruptcy Out" in Legal Opinions, 48 Ford-ham L.Rev. 277, 279 (1979) (automatic stay “has a direct effect on the enforceability of the original agreement,” therefore counsel should insert "bankruptcy out” in enforcement opinion to apprise client of "limitation on its scope"). Cf. Nimmer, supra, 68 Minn.L.Rev. at 4 ("Modification of the secured creditor’s bargain is justified by the desire to provide an opportunity for the *1415 restructuring necessary to retain the going concern value of the debtor.").
One case decided under the Act expressly noted how bankruptcy laws can alter the bargain of the parties, even assuming that they contemplated the award of postpetition interest. In In re Boston and Maine Corp., 719 F.2d 493 (1st Cir.1983), cert. denied, 466 U.S. 938, 104 S.Ct. 1913, 80 L.Ed.2d 461 (1984), the court stated:
The two parties have bargained with reference to a specific security with the expectation that the creditor may sell this security and realize the entire amount of the outstanding obligation, including interest accrued to the date of payment. To deny such a creditor post-petition interest, when the amount of the security is sufficient to cover both the principal and interest due, would undermine the faith of lenders in the efficacy of credit arrange-ments____ Thus, granting post-petition interest to mortgages and other holders of contractual liens satisfies the expectations of the parties and strikes an equitable balance between the creditors and the debtors.
Id. at 497 (emphasis added).

. The American Mariner court analyzed the issue as follows:
Although the Senate version of section 361 proposed to protect "the value of such entity’s interest in such property," the section was considerably more restrictive than the House version. S.Rep. No. 989, 95th Cong.2d Sess. 54, 1978 U.S. Code Cong. & Ad. News 5787, 5840. As a gloss on one of the two methods permitted by the Senate version for providing adequate protection, the Senate Report notes that the method was “consistent with the view expressed in Wright v. Union Central Life Ins. Co., 3 IT U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940), where the Court suggested that it was the value of the secured creditor’s collateral, and not necessarily his rights in specific collateral, that was entitled to protection.” Id. Read in the context of the broad scope attributed to the term "value” in section 361 and the wide range of interests to be protected, we think the citation to Wright cannot be construed to limit adequate protection to the value of the collateral. Nonetheless, no such gloss appears in the House Report on its version of section 361, and its expansive approach to adequate protection was ultimately adopted by Congress. The only reference to Wright in the House Report is the observation that adequate protection under section 361 is not confined to the constitutional protection required in Wright. H.R. Rep. No. 595 at 339, 1978 U.S. Code Cong. & Ad. News at 6295.
734 F.2d at 430 n. 4 (emphasis .added). The court's conclusion that the Senate’s version of § 361 was "restrictive” and the House’s version "expansive” needs some explanation. The Senate version of § 361 provided creditors with far more protection than the House version of § 361, because it did not force them to accept uncertain and risky administrative priorities or unspecified "other relief," as did the House bill. Further, under the Senate’s proposed § 362(d), relief was to be granted within 30 days of the hearing on the motion for relief, and relief was to be granted whenever the court found no equity in the property. Both these aspects of the Senate’s bill were far more "pro-creditor” than the House bill. The only "expansive” aspect of the House bill was the language of the report accompanying it, which was not reflected in the text of H.R. 8200 as passed by the House. A cogent analysis of the language of the House report notes that although the “Code does not make any significant new contribution to the concept of adequate protection, but instead borrows the more effective devices developed by the courts under the Bankruptcy Act [, t]he House Committee Report’s attempted restatement of those principles confuses the issues.” Moller & Foltz, supra, 58 N.C.L.Rev. at 900.